In re **ROTH AMERICAN, INC.,** Debtor.

**Teamsters Local Union No. 401
Health & Welfare Fund**

**International Brotherhood of Teamsters,
Local 401,** Appellant.

No. 91–5564.

United States Court of Appeals,
Third Circuit.

Argued July 7, 1992.

Decided Sept. 3, 1992.

Patrick J. Szymanski (argued), Christy Concannon, Baptiste & Wilder P.C., Washington, D.C., John J. Dunn, Sr., Dunn & Byrne Law Offices, Scranton, Pa., for appellant.

Robert C. Nowalis (argued), Doran & Nowalis, Wilkes–Barre, Pa., for appellee.

Before: SLOVITER, Chief Judge, STAPLETON and SEITZ, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Before us is an appeal by the International Brotherhood of Teamsters Local 401 (the Union) from a district court order that affirmed a bankruptcy court order (1) rejecting the Union's claim for unearned wages for breach of a post-petition agreement to maintain operations for two years, and (2) ruling that the Union's claims for severance pay and vacation pay against a Chapter 11 debtor, Roth American, Inc., were entitled to an administrative priority

only to the extent that these benefits were earned post-petition.

### I.

### *Facts and Procedural History*

Roth American, Inc., was a manufacturer of toys and gym sets in Wilkes–Barre, Pennsylvania, employing over 200 persons who were represented by Teamsters Local 401. In 1985, the company and the Union entered into a collective bargaining agreement covering the period from November 1, 1985 until June 30, 1988.

On February 2, 1988, Roth American filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. In the meantime, Roth American had negotiated with the Union to obtain a modification of the collective bargaining agreement that was embodied in a separate memorandum of agreement. The 1988 memorandum of agreement, which became effective on February 4, 1988,[1] extended the existing collective bargaining agreement until January 1, 1989 and provided for a reduction in wages of seventy cents per hour across the board. Of particular importance to this appeal, it also provided:

> The Employer will maintain the operations covered by the current Collective Bargaining Agreement in the Wilkes–Barre area for a minimum of two (2) years, commencing upon the effective date of this Memorandum of Agreement. This commitment also includes the representation that equipment necessary to the operations of those facilities will not be moved from the Wilkes–Barre area.

App. at 27. Neither party sought approval of the new agreement from the bankruptcy court, nor was there any hearing before the bankruptcy court at which creditors could object to the new agreement.

Despite the seventy cent wage concession provided in the 1988 memorandum agreement, the employer only paid the lower wage for a two-week period. It resumed paying the preexisting higher wage when it could no longer provide the health insur-

---

1. The union concedes that the 1988 memorandum agreement did not become effective until after Roth American filed its bankruptcy petition.

ance coverage mandated by the memorandum agreement.

Roth American continued its operations for several months following the bankruptcy petition. In April 1988, the company entered into a contract, approved by the bankruptcy court, whereby the Michael Fox Company would solicit bids for the company initially in its entirety and, if that were unsuccessful, in its various parts. On June 5, 1988, Roth American ceased all manufacturing activity and laid off all its employees. On August 17, 1988, the bankruptcy court approved, over the Union's objection, the piecemeal sale of Roth American pursuant to the best bids that were received.

The Union filed three proofs of claim in the bankruptcy proceeding on behalf of the Roth American employees it represented. One claim sought damages of approximately $6.5 million in future wages and benefits for breach of the provision in the February 1988 memorandum agreement to maintain operations in Wilkes–Barre for at least two years. The other two claims were for approximately $246,000 in vacation pay and approximately $105,000 in severance pay due the employees under the terms of the 1985 collective bargaining agreement.

The bankruptcy court granted the Union's claim for damages for breach of contract only to the extent of the reduction in wages the employees were paid during the two week period following the new agreement. 120 B.R. 356. The bankruptcy court reasoned that because the 1988 memorandum agreement "was not accepted or rejected under the terms of the United States Bankruptcy Code," it was not "a valid post-petition Collective Bargaining Agreement." App. at 216. Alternatively, the court reasoned that the 1985 Collective Bargaining Agreement did not "provide any guarantees of continued employment," and therefore could not give rise to a claim for future unearned wages. App. at 218. Accordingly, the court held that since "[t]he employees received all their post-petition wages in full except for a two week period in which they were paid less than the amount called for in the Collective

Bargaining Agreement[, t]his is the only measure of damages available to the Union." *Id.*

The bankruptcy court further ruled that the Union's claims for severance pay and vacation pay under the 1985 agreement were allowable, but that administrative expense priority would be accorded those claims "only for the amount of severance and vacation pay earned post-petition." App. at 210. The remainder of these claims were "divided into either a priority or unsecured claim as the Bankruptcy Code dictates," *id.*, signifying that the amounts earned within 90 days of the bankruptcy filing up to $2,000 per individual would get third priority under 11 U.S.C. § 507(a)(3), and the remainder would be accorded general unsecured claim status.

The Union appealed the bankruptcy court's decision to the United States District Court for the Middle District of Pennsylvania, which affirmed the bankruptcy court's decision in all respects. The district court agreed with the bankruptcy court that the 1988 memorandum agreement was not valid, reasoning that the enactment of 11 U.S.C. § 1113 demonstrated that "post-petition activity with respect to collective bargaining agreements are not transactions in the ordinary course of business and require a modicum of Bankruptcy Court supervision." App. at 240. Alternatively, the court stated that even if the 1988 memorandum agreement were enforceable, the language in that agreement did not guarantee future employment and therefore could not give rise to a claim for future unearned wages and benefits. The district court also agreed with the bankruptcy court's analysis of the priority to be accorded the Union's vacation pay and severance pay claims, reasoning that nothing in 11 U.S.C. § 1113 was intended to alter the priority to be accorded such claims.

On this appeal, the Union argues that the 1988 memorandum agreement was a transaction in the "ordinary course of business" within the meaning of 11 U.S.C. § 363(c) and that therefore a hearing before the bankruptcy court was not required for the agreement to be fully enforceable. The

Union also contends that the bankruptcy court erred in not granting the full amount of its claims for severance pay and vacation pay first priority as administrative expenses.

■■ We have appellate jurisdiction pursuant to 28 U.S.C. § 158(d) (1988). Our review of the district court's decision "effectively amounts to review of the bankruptcy court's opinion in the first instance." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir.1989). We have plenary review over the interpretation of the provisions of the Bankruptcy Code. *See In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir.1986).

## II.

### *Discussion*

#### A.

#### *Union's Claim for Breach of 1988 Memorandum Agreement*

The validity of the Union's claim for breach of the 1988 memorandum agreement turns on whether notice to creditors and a hearing before the bankruptcy court were required for the 1988 memorandum agreement to be enforceable. Only if the agreement is enforceable, would we need to answer the extent to which the Union is entitled to damages for its breach.

Section 363(c)(1) of the Bankruptcy Code provides:

> If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions ... *in the ordinary course of business*, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

**2.** Although section 363 speaks only of the authority of a trustee, 11 U.S.C. § 1107(a) grants a debtor-in-possession "all the rights" of a trustee (with several exceptions not here pertinent).

**3.** In the event that a transaction is undertaken that is not in the ordinary course of business

11 U.S.C. § 363(c)(1) (1988) (emphasis added).[2] In contrast, a notice and hearing are required before the trustee (or debtor-in-possession) may use property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)(1).[3]

The framework of section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary. *See United States ex rel. Harrison v. Estate of Deutscher (In re H & S Transp. Co.)*, 115 B.R. 592, 599 (M.D.Tenn. 1990) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets."). Creditors are not given the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves." *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y.1983).

■■ Neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether particular transactions are in the ordinary course of a debtor's business for the purpose of section 363. In prior cases, the courts have engaged in a two-step inquiry for determining whether a transaction is in "the ordinary course of business": a "horizontal dimension" test and a "vertical dimension" test. *See* Benjamin Weintraub & Alan N. Resnick, The Meaning of "Ordinary Course of Business" Under the Bankruptcy Code—Vertical and Horizontal Analysis, 19 UCC L.J. 364 (1987) [hereinafter Weintraub & Resnick].[4]

without notice and a hearing, it may be avoided in bankruptcy. *See* 11 U.S.C. § 549(a)(2)(B).

**4.** This framework has been routinely applied by many courts. *See, e.g., In re Dant & Russell, Inc.*, 853 F.2d 700, 704–06 (9th Cir.1988) (applying vertical and horizontal framework to conclude debtor-in-possession's post-petition execu-

The inquiry deemed horizontal is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry. *Id.* at 367. For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." *In re Waterfront Cos.*, 56 B.R. 31, 35 (Bankr.D.Minn.1985).

The inquiry deemed vertical (more appropriately characterized as the creditor's expectation test) analyzes the transactions " 'from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit.' " Weintraub & Resnick, 19 UCC L.J. at 365 (quoting *In re Johns–Manville Corp.*, 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986)). Under this test, "[t]he touchstone of 'ordinariness' is ... the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *James A. Phillips*, 29 B.R. at 394. The primary focus thus is on the debtor's pre-petition business practices and conduct, although a court must also "consider the changing circumstances inherent in the hypothetical creditor's expectations." Weintraub & Resnick, 19 UCC L.J. at 366.

In this case, satisfaction of the horizontal test is readily apparent—many manufacturing companies have routinely entered into extensions of collective bargaining agreements in order to secure the continued benefits of a unionized workforce. Accordingly, several courts have ruled that post-petition collective bargaining agreements were in the ordinary course of business. *See In re DeLuca Distributing Co.*, 38 B.R. 588, 594 (Bankr.N.D.Ohio 1984) (new collective bargaining agreement in ordinary course of business because employees were

covered by agreement prior to bankruptcy); *see also In re Illinois–California Express, Inc.*, 72 B.R. 987, 991 (D.Colo.1987) (post-petition renegotiation of labor agreement without prior court approval was valid because it was transaction in the ordinary course of business); *In re IML Freight, Inc.*, 37 B.R. 556, 559 (Bankr.D.Utah 1984) (decision to enter into a post-petition collective bargaining agreement falls within debtor-in-possession's discretion to make decisions in the ordinary course of business). The National Labor Relations Board has also noted that a debtor may enter into valid collective bargaining agreements in the ordinary course of business. *See Sealift Maritime, Inc.*, 265 N.L.R.B. 1219 (1982) (petition of rival union seeking to represent employees of Chapter 11 debtor denied because modification and extension of preexisting collective bargaining agreement with different union was valid without bankruptcy court approval as transaction in the ordinary course of business).

■ The particular provisions of post-petition collective bargaining agreements must also be examined with reference to the reasonable expectations of creditors. Roth American argues that even if post-petition collective bargaining agreements may be "ordinary course of business" transactions, the nature of the particular agreement here was extraordinary inasmuch as it purported to bind the debtor to maintain its existing operations in the Wilkes–Barre area for two years.

We find Roth American's argument persuasive. The 1988 memorandum agreement is fundamentally different from the previous collective bargaining agreements entered into between Roth American and the Teamsters insofar as it contains the provision purporting to bind Roth American to maintain its operations. As has been stated by the Supreme Court:

tion of leases was in ordinary course of business); *Habinger, Inc. v. Metro. Cosmetic & Reconstructive Surgical Clinic*, 124 B.R. 784, 786 (D.Minn.1990) (applying framework to debtor's post-petition payments for furniture and equipment); *United States ex rel. Harrison*, 115 B.R. at 598–99 (applying framework to conclude

trustee's use of funds to repair boats, institute maintenance program, and reinstate insurance was in ordinary course of business); *In re Glosser Bros.*, 124 B.R. 664, 667–68 (Bankr.W.D.Pa. 1991) (applying framework to execution of licensing agreement to operate department in debtor's stores).

Collective bargaining between employer and the representatives of a unit ... results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in *rare cases;* no one has a job by reason of it and *no obligation to any individual ordinarily comes into existence from it alone.*

*J.I. Case Co. v. NLRB,* 321 U.S. 332, 334–35, 64 S.Ct. 576, 579, 88 L.Ed. 762 (1944) (emphasis added); *see also In re Continental Airlines Corp.,* 901 F.2d 1259, 1264 (5th Cir.1990) ("ordinarily a collective bargaining agreement ... neither obligates any employee to perform work *nor requires the employer to provide work*") (emphasis added).

In contrast, the 1988 memorandum agreement here sought to bind the hands of a Chapter 11 debtor to maintain its then existing operations for two years in the Wilkes–Barre area. Thus, while "changes between prepetition and postpetition business activity alone are not *per se* evidence of extraordinariness," *Johns–Manville,* 60 B.R. at 617, we conclude that the nature of the agreement here ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken in the circumstances. *See In re Century Brass Prods.,* 107 B.R. 8 (Bankr. D.Conn.1989) (large post-petition severance pay agreements entered into between debtor and debtor's officer not in ordinary course of business because no comparable severance pay agreement had ever been entered into between the debtor and its officers in past); *cf. In re Waterfront Cos.,* 56 B.R. at 35 ("Some transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary."). Accordingly, we hold that the 1988 memorandum agreement was not a transaction in the ordinary course of business. It follows that the district court did not err in holding that notice and a hearing in the bankruptcy

court on that agreement was required for it to be enforceable.[5]

### B.
### *Vacation Pay and Severance Pay Claims*

The Union also contends that the district and bankruptcy courts erred in failing to accord the full amount of its claims for vacation pay and severance pay under the 1985 collective bargaining agreement first priority as administrative expenses under 11 U.S.C. §§ 503(b) and 507(a)(1). Roth American concedes that the Union presented valid claims for vacation pay and severance pay. The dispute between the parties on this issue is limited solely to the priority to be accorded these claims. The bankruptcy court, affirmed by the district court, granted an administrative priority only to those benefits earned as compensation for services rendered post-petition. The remainder of these benefits claims were classified as third priority under section 507(a)(3) to the extent they were earned within 90 days of bankruptcy, with the residual amounts classified as general unsecured claims.

Section 507(a)(1) of the Bankruptcy Code provides: "First [priority is given to] administrative expenses allowed under section 503(b) of this title...." 11 U.S.C. § 507(a)(1). Section 503(b)(1)(A) provides that administrative expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services *rendered after the commencement of the case.*" 11 U.S.C. § 503(b)(1)(A) (emphasis added).

The Union argues that all of the vacation pay and severance pay due under the collective bargaining agreement is an administrative expense, regardless of whether the benefits were earned pre-petition or post-petition. It argues that because the 1985 collective bargaining agreement was not rejected through the detailed procedures set forth in 11 U.S.C. § 1113, Roth American assumed the agreement by operation of

---

**5.** In light of our disposition, we need not reach the alternative argument raised by Roth American that the 1988 memorandum agreement does

not constitute a guarantee of employment and therefore cannot give rise to a claim for future wages.

law and became bound by all its terms. The Union contends that 11 U.S.C. § 1113(f) grants its claims first priority, since it provides that "[n]o provision [of the Bankruptcy Code] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." The Union thus apparently equates the failure to give its claims first priority to a unilateral termination or alteration of the 1985 collective bargaining agreement.

As support, the Union cites *In re Unimet Corp.*, 842 F.2d 879 (6th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988), which presented the question whether a debtor-in-possession was required to pay insurance premiums for retiree benefits due under the terms of an unrejected collective bargaining agreement. The principal issue in the case was whether 11 U.S.C. § 1113 covered the collectively bargained rights of *retirees*, as opposed to *employees*. The bankruptcy court in *Unimet* had concluded that retirees could not be considered "employees" whose rights were protected under 11 U.S.C. § 1113. On appeal, the Sixth Circuit held that section 1113 applied to retirees as well as current employees.[6] Without ruling on the union's argument that the retiree benefits were also administrative expenses under 11 U.S.C. § 503(b), the court stated that its holding that 11 U.S.C. § 1113 encompasses retiree benefits "leads to the conclusion that qualification as an administrative expense is not necessary for the union to prevail." *Id.* at 884. It continued, because "section 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement ... Unimet cannot escape its obligations in this regard merely because the requirements of section 503 arguably have not been satisfied." *Id.* (footnote omitted).

Several subsequent district and bankruptcy court decisions have relied upon *Unimet* for the proposition that regardless of whether claims under unrejected collective bargaining agreements are administrative expenses within the meaning of 11 U.S.C. § 503, such claims are entitled to a "superiority" or automatic first priority pursuant to section 1113(f). *See United Steelworkers of America v. Ohio Corrugating Co.*, No. 4:90CV0810, 1991 WL 213850, 1991 U.S.Dist. LEXIS 18815 (N.D.Ohio March 15, 1991); *In re Arlene's Sportswear*, 140 B.R. 25, 28 (Bankr. D.Mass.1992); *In re Golden Distribs., Ltd.*, 134 B.R. 760, 765 (Bankr.S.D.N.Y. 1991); *In re St. Louis Globe–Democrat, Inc.*, 86 B.R. 606, 609–10 (Bankr.E.D.Mo. 1988).

In evaluating the impact of section 1113 on this case, it is important to consider the circumstances leading to its enactment. The section was "enacted by Congress in response to the Supreme Court's opinion in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 [104 S.Ct. 1188, 79 L.Ed.2d 482] (1984)." *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1081 (3d Cir.1986). In *Bildisco*, the Supreme Court had held that a collective bargaining agreement is an executory contract subject to rejection by a debtor-in-possession under section 365(a)[7] of the Bankruptcy Code. The Court also held that the bankruptcy court should permit rejection of the collective bargaining agreement if "the debtor can show that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." 465 U.S. at 526, 104 S.Ct. at 1196. In effect, the Court's opinion permitted a debtor to treat the collective bargaining agreement similar to any other executory contract.

As we noted in *Wheeling–Pittsburgh*, after the Supreme Court announced its *Bildisco* decision, "labor groups mounted an immediate and intense lobbying effort in

---

**6.** After the *Unimet* decision, Congress enacted 11 U.S.C. § 1114, which explicitly covers retiree benefits.

**7.** Section 365(a) provides, in pertinent part, that "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." 11 U.S.C. § 365(a).

Congress to change the law," which culminated in the enactment of section 1113.[8] 791 F.2d at 1082. In enacting section 1113, Congress intended to preclude employers from using bankruptcy law as an offensive weapon in labor relations by going into bankruptcy and unilaterally rejecting or modifying the extant collective bargaining agreement (or exerting leverage at the bargaining table by threatening to do so). *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990–91 (2d Cir.1990). However, there is no indication either from the language or the legislative history of section 1113 that Congress intended to address the priority to be given claims based on a collective bargaining agreement.

Of most significance is the fact that no language in section 1113 addresses the priority to be accorded claims. In contrast, section 1114, which was enacted to protect retiree benefits, explicitly gives such claims administrative priority. Section 1114(e)(2) provides that "[a]ny payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an *allowed administrative expense* as provided in section 503 of this title." 11 U.S.C. § 1114(e)(2) (emphasis added). Thus, "[s]ection 1114(e)(2) gives payment of retiree benefits status as an allowed administrative expense.... *regardless of when the right to receive such benefits vests.*" 5 Lawrence P. King et al., Collier on Bankruptcy, ¶ 1114.02[2][a], at 1114–14 (15th ed. 1992). Similarly, in other situations in which Congress intended to alter the priority scheme established in section 507, it has done so explicitly. *See* 11 U.S.C. § 364(c)(1) (bankruptcy court may authorize the obtaining of credit that has "priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title").

We agree with the bankruptcy court in *In re The Ohio Corrugating Co.*, 115 B.R. 572, 578 (Bankr.N.D.Ohio 1990), *rev'd*, No. 4:90CV0810, 1991 WL 213850, 1991 U.S. Dist. LEXIS 18815 (N.D.Ohio March 15, 1991), which observed that construing section 1113(f) as mandating a first priority for all claims, whether earned pre-petition or post-petition, based on collective bargaining agreements would "leave in its wake a series of anomalous results." The court elaborated: "Why, for example, should the very same pre-petition obligations receive an unlimited first priority if the employer debtor files under Chapter 11 but only a third or fourth priority, limited in dollar amount per employee, if the case is filed under Chapter 7?"[9] *Id.* The court added that "[i]f post-petition administrative expenses can be, in effect, wiped out by pre-petition employment related obligations a strong disincentive to reorganization under Chapter 11 would be created." *Id.*

That court's conclusion that section 1113 "governs only the conditions under which a debtor may modify or reject a collective bargaining agreement," *id.*, although reversed by the district court under the authority of that circuit's precedent in *Unimet*, has also been reached by other courts considering this issue. *See In re Armstrong Store Fixtures Corp.*, 135 B.R. 18, 22 (Bankr.W.D.Pa.1992) ("section 1113(f) does not supersede and render § 507(a) inoperative when determining the priority to be accorded to employee claims"); *In re*

---

8. In section 1113, Congress erected both procedural and substantive obstacles to a debtor's rejection or modification of a collective bargaining agreement. Before filing an application seeking rejection of a collective bargaining agreement, the debtor-in-possession must make a proposal to the representative of the employees "which provides for those *necessary* modifications ... that are *necessary to permit* the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably," 11 U.S.C. § 1113(b)(1)(A) (emphasis added), and must "confer in good faith [with the union] in attempting to reach mutually satisfactory modifications of such agreement." *Id.* § 1113(b)(2). Only after these requirements have been met may a court approve an application for rejection, and then still only if the union "has refused to accept [the] proposal without good cause" and "the balance of the equities clearly favors rejection of [the] agreement." *Id.* § 1113(c). *See generally Wheeling–Pittsburgh*, 791 F.2d at 1084–94.

9. This anomaly would result from the fact that section 1113 does not apply in Chapter 7 cases. *See* 11 U.S.C. § 103(f).

*Murray Industries,* 110 B.R. 585, 588 (Bankr.M.D.Fla.1990) ("the better view is one which reconciles § 507 with § 1113 and that § 1113 governs only the conditions under which a Debtor-in-Possession may modify or reject a collective bargaining agreement, but that payment of employment-related prepetition obligations is governed exclusively by § 507"), *vacated as moot,* 140 B.R. 298 (Bankr.M.D.Fla.1992). Moreover, *Unimet* itself is of questionable application in this situation because it did not involve either a Chapter 11 liquidation or the question of priority. *See Ohio Corrugating,* 115 B.R. at 575.[10]

It has been suggested that if section 1113 were not construed as creating a superpriority, it would "virtually delete[ ] § 1113 from the Bankruptcy Code." *See Arlene's Sportswear,* 140 B.R. at 28. We believe that concern is unpersuasive. The congressional goal embodied in section 1113 to give special consideration to a collective bargaining agreement and encourage the debtor and the union to reach a mutually acceptable agreement while the provisions of the current agreement remain in effect until the bankruptcy court authorizes unilateral rejection or modification of the agreement pursuant to section 1113, *see generally Wheeling–Pittsburgh,* 791 F.2d at 1084–94, can be satisfied without interfering with the previously established statutory priorities.

The Union contends that since Roth American has not sought to reject the collective bargaining agreement under section 1113, Roth American has "assumed" the collective bargaining agreement by operation of law, and that Roth American thus is bound by all of its terms. We agree with the Union up to this point. But it simply does not follow, as the Union contends, that all claims under unrejected collective bargaining agreements are entitled to first priority.

The Union's argument fails to account for the substantial body of case law decid-ing the proper priority to be given claims for vacation pay and severance pay. The prevailing view regarding vacation pay claims under a collective bargaining agreement in bankruptcy is that such claims are accorded administrative priority " 'only to the extent of the proportionate part of total vacation pay earned during the period from the beginning of the bankruptcy administration to the date of termination of employment.' " 3 Lawrence P. King et al., Collier on Bankruptcy, ¶ 503.04[1][a][iii], at 503–29 (15th ed. 1992) (quoting *Straus–Duparquet, Inc. v. Local Union No. 3, International Brotherhood of Electrical Workers,* 386 F.2d 649 (2d Cir.1967)). This court has long since followed this approach as to vacation pay. *See In re Public Ledger,* 161 F.2d 762, 768–69 (3d Cir.1947).

The status of severance pay claims presents a somewhat different issue in that courts have distinguished between two types of severance pay: "(1) pay at termination in lieu of notice; and, (2) pay at termination based on length of employment." *In re Health Maintenance Found.,* 680 F.2d 619, 621 (9th Cir.1982). The claims in this case fall within the second category, because the collective bargaining agreement mandates payments based on length of service. This court, along with the vast majority that have considered the type of severance pay claim at issue here, has held that these claims, like vacation pay claims, only have administrative priority to the extent that they are based on services provided to the bankruptcy estate post-petition. *See Public Ledger,* 161 F.2d at 773; *see also Health Maintenance Found.,* 680 F.2d at 621; *In re Mammoth Mart, Inc.,* 536 F.2d 950, 953 (1st Cir.1976); *Rawson Food Serv. v. Creditors' Comm.,* 67 B.R. 351, 353 (M.D.Fla. 1986) (severance pay claims based on employees' years of service with debtor do not get administrative expense priority because consideration given for claim accrues over entire period of employment and not just from post-petition events); *cf. In re Ama-*

---

**10.** We note that it is not clear whether the Sixth Circuit in *Unimet* determined what *priority* should be accorded the union's claim; the court only reversed the judgment of the district court "to the extent that it held that 11 U.S.C. § 1113 does not protect the interests of retirees." 842 F.2d at 886.

*rex, Inc.*, 853 F.2d 1526, 1530 n. 4 & 1531–32 (10th Cir.1988) (annual bonus due debtor's general counsel under employment agreement only has administrative priority to extent based on services rendered post-petition). *But see Straus–Duparquet*, 386 F.2d at 651 (because severance pay is compensation for termination of employment, and employment is terminated by trustee in administering bankruptcy estate, severance pay is administrative expense). *See generally* 3 Lawrence P. King et al., Collier on Bankruptcy, ¶ 503.04[1][a][iii], at 503–29 to 503–31.

Furthermore, several courts have held that even if the trustee has implicitly assumed the collective bargaining agreement under which vacation and severance pay claims are based, such claims should still be given administrative priority only to the extent that they are for compensation for services rendered post-petition. *See Health Maintenance Found.*, 680 F.2d at 622 (even if trustee assumed collective bargaining agreement, that would not alter rule that severance pay claim should only be given administrative priority to extent earned post-petition); *Public Ledger*, 161 F.2d at 771–74.

 It follows that the district and bankruptcy courts in this case did not err in according the Union's claims for vacation pay and severance pay first priority as administrative expenses only to the extent that these benefits were earned by services rendered post-petition. The treatment given the vacation pay and severance pay claims is consistent both with the plain language of section 503(b), under which administrative expenses are defined as "the actual, necessary costs and expenses of preserving the *estate*, including wages, salaries, or commissions *for services rendered after the commencement of the case*," 11 U.S.C. § 503(b)(1)(A) (emphasis added), and with the policy underlying the first priority treatment of administrative expenses: to ensure that the services needed to preserve the estate will be performed by minimizing the risk that the debtor will ultimately not be able to provide payment therefor. *See*

*Health Maintenance Found.*, 680 F.2d at 621.

## III.

### Conclusion

We have concluded that the 1988 memorandum agreement entered into between Roth American and the Teamsters was not a transaction in the ordinary course of business within the meaning of section 363(c). Therefore, the Union's claim for breach of contract could be granted only for the two week period in which the wages paid to the employees were below the amount required by the 1985 collective bargaining agreement. We have also concluded that 11 U.S.C. § 1113 does not create a superpriority or automatic first priority for claims under an unrejected collective bargaining agreement. Therefore, we will affirm the order of the district court affirming the judgment of the bankruptcy court.