**In re GIT–N–GO, INC., Debtor In Possession.**

**No. 04–10509–R.**

United States Bankruptcy Court, N.D. Oklahoma.

Nov. 23, 2004.

---

John David Dale, Jeffrey D. Hassell, Sidney K. Swinson, Gable & Gotwals, Tulsa, OK, for Debtor.

Leslie Rickets, Michael McBride, Michael McMahan, J. Michael McBride, P.C., Fort Worth, TX, for Movant.

***ORDER DENYING MOTION BY BRINK'S, INCORPORATED FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE PRIORITY CLAIM***

DANA L. RASURE, Bankruptcy Judge.

Before the Court is the Motion by Brink's, Incorporated for Allowance and

Payment of Administrative Priority Claim, filed on September 16, 2004 (Doc. 962) (the "Motion"); Debtor–in–Possession's Objection to Motion of Brink's, Incorporated for Allowance and Payment of Administrative Priority Claim, filed on October 6, 2004 (Doc. 990) (the "GNG Objection"); and the Objection of The F & M Bank and Trust Company to Motion for Administrative Claim by Brink's Incorporated, filed on October 8, 2004 (Doc. 992) (the "F & M Objection").

An evidentiary hearing was held on November 10, 2004, at which Brink's Incorporated ("Brink's") appeared through its counsel, Leslie Ricketts; the Debtor–in–Possession, Git–N–Go, Inc. ("GNG"), appeared through its counsel, Sidney Swinson; and The F & M Bank and Trust Company ("F & M") appeared through its counsel, J Schaad Titus.

Upon consideration of the record in this case, the pleadings, the testimony and documentary evidence admitted at the hearing, arguments of counsel and applicable law, the Court finds and concludes as follows:

### I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A), (B), (M), and (O); and Miscellaneous Order No. 128 of the United States District Court for the Northern District of Oklahoma: Order of Referral of Bankruptcy Cases effective July 10, 1984, as amended.

### II. Contentions of the parties

Brink's contends that GNG and Brink's entered into a postpetition one-year contract for security services and that GNG breached the contract by terminating it prior to the expiration of its term and by failing to pay the remaining installments when due. Brink's contends that GNG owes Brink's $117,256.00 for the unpaid balance of the contract. Brink's further argues that because the contract was entered into postpetition, damages for its breach constitute an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A) which is entitled to priority in payment by virtue of 11 U.S.C. § 507(a)(1).

GNG concedes that it entered into the postpetition contract with Brink's, but asserts that the transaction was outside the ordinary course of business and constituted a compromise. Because the contract was not presented to the Court and parties in interest for consideration and approval pursuant to 11 U.S.C. § 363(b) or Bankruptcy Rule 9019, GNG contends that it is unenforceable. In addition, GNG argues that because Brink's did not provide any services to the estate after GNG terminated the contract, Brink's claim is not an "actual, necessary cost[ ] and expense[ ] of preserving the estate" and therefore does not qualify as an administrative expense under 11 U.S.C. § 503(b)(1)(A). GNG also disputes the amount of the claim, contending that Brink's calculation of damages is not supported by contract law.

F & M joins GNG in arguing that the contract is not enforceable and does not benefit the estate, and also contends that the estate has no unencumbered cash from which to pay Brink's claim. F & M specifically objects to the payment of Brink's claim from F & M's cash collateral because F & M has not consented to such use of its cash collateral, nor has the Court approved of such a use in a cash collateral order.

### III. Findings of fact

The Court finds that notice of the Motion and the hearing were appropriate.

On January 30, 2004, GNG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition

Date"). For a period of fifteen to seventeen years prior to the Petition Date, Brink's provided armored transportation services to GNG under various written contracts. These services included transporting cash of up to $25,000 from each of GNG's convenience stores to GNG's designated banks on a daily basis. Brink's provides similar services to other convenience store chains.

On October 5, 2000, GNG and Brink's entered into a contract, effective November 1, 2000, for a three year term and "thereafter from year to year until cancelled, by either party, on thirty days written notice prior to any anniversary date hereof." Brink's Exhibit 3 (the "2000 Agreement"). The 2000 Agreement, in which Brink's agreed to provide armored transport services to approximately fifty of GNG's convenience stores in the Tulsa metropolitan area, superseded and canceled a prior contract between the parties dated November 1, 1997. The parties refer to the stores within the Tulsa metropolitan area as "Tulsa metro locations." The parties agree that the 2000 Agreement expired by its terms on or about November 1, 2003, and that as of the Petition Date, GNG did not have a contract with Brink's to service its Tulsa metro locations.

On May 31, 2001, GNG and Brink's entered into a contract, effective June 13, 2001, in which Brink's agreed to provide armored transport services to twenty-one of GNG's convenience stores that were located *outside* the Tulsa metropolitan area. Brink's Exhibit 2 (the "2001 Agreement"). The parties refer to these stores as "over the road locations." The contract

indicated that it was a "NEW" contract that did not supersede or cancel any prior contract. The 2001 Agreement was to be effective for a period of three years "and thereafter from year to year until cancelled, by either party, on thirty days written notice prior to any anniversary date hereof." As of the Petition Date, the 2001 Agreement was in its third year and would not expire until June 13, 2004. Under the 2001 Agreement, Brink's was permitted to charge $580 to $690 per month for servicing each over the road location in the third year, for a total of $12,730 per month. As of the Petition Date, GNG had not paid the January 2004 installment and the total of the monthly installments remaining under the 2001 Agreement was $57,285.[1]

On or about April 11, 2003, GNG entered into a contract with Loomis, Fargo & Co. ("Loomis") to provide armored transport services to seventy-eight stores (including both Tulsa metro and over the road locations) beginning December 1, 2003 and continuing for a term of two years (the "Loomis Contract"). Some of the over the road locations were the same stores Brink's was under contract to service through June 2004 pursuant to the 2001 Agreement. Loomis serviced the Tulsa metro and the over the road locations[2] from December 1, 2003 until its contract was rejected by GNG in March 2004.

In February 2004, GNG's chief restructuring officer instructed GNG's president, Ron Ford, to obtain new bids from Brink's and Loomis for postpetition armored transport services because GNG intended to reject the 2001 Agreement and the Loomis Contract. On February 18, 2004,

1. Calculated by multiplying $12,730 by 4½ months (January 30, 2004 to June 13, 2004).

2. While both Loomis and Brink's had contracted to service the over the road locations, and GNG was contractually obligated to pay both providers, only Loomis serviced these locations between December 1, 2003 and March 2004.

approximately three weeks after the Petition Date, Ron Ford negotiated and executed a services agreement with Brink's, in which Brink's agreed to provide armored transport services to GNG beginning on March 1, 2004 and continuing "for a period of one year and thereafter from year to year until cancelled, by either party, on thirty (30) days written notice prior to any anniversary date hereof." Brink's Exhibit 1 (the "2004 Agreement"). Having been advised that GNG had or would reject the 2001 Agreement, Brink's agreed to provide services going forward under the terms of the new agreement. The 2004 Agreement specifically states that it supersedes and cancels the 2000 Agreement (which had already expired). The 2004 Agreement also provides—

> This Agreement and the applicable Schedules, exhibits, attachments and/or riders that are incorporated herein by reference, all as may be amended from time to time, constitute the entire agreement between Customer and Brink's with respect to the subject matter hereof and *supersede and cancel any and all prior and/or contemporaneous offers, negotiations, promises, exceptions and understandings, whether oral or written, express or implied between the parties.* This Agreement may be altered, amended or superceded in writing signed by the parties or by an executed oral agreement, unless otherwise specified herein.

Brink's Exhibit 1, ¶ X(6) (emphasis added). Thus, although the parties did not specifically discuss "settling" or "compromising" the 2001 Agreement, Brink's form of contract had the effect of canceling and superseding the 2001 Agreement as of March 1, 2004.

On March 11, 2004, GNG filed a motion to reject the Loomis Contract and a Brink's contract dated May 31, 2003 (which the parties agree was the 2001 Agreement) and the motion was granted on March 30, 2004. GNG Exhibits 4 and 5. It is undisputed that after the Loomis Contract was rejected, GNG expected Brink's to provide all armored transport services to GNG at the rates and on the terms set forth in the 2004 Agreement for as long as such services were necessary.

In the 2004 Agreement, Brink's agreed to provide services to twenty-two Tulsa metro locations and to eighteen over the road locations.[3] For transporting money from the stores to GNG's designated bank, Brink's agreed to charge a monthly fee of $260 to $312 for each Tulsa metro location and $425 for each over the road location. Brink's also agreed to charge a monthly fee of $195 for transporting "paperwork, payroll, reports, VCR tapes" from a designated office to GNG's headquarters five days a week. GNG's monthly obligation under the 2004 Agreement was $14,657. Brink's relied upon GNG's chapter 11 status in bidding on and entering into the 2004 Agreement, believing that GNG's obligations under the contract would be paid on a priority basis.

The 2004 Agreement did not require GNG to seek and obtain Bankruptcy Court approval of the transaction and GNG did not seek or obtain Bankruptcy Court approval. As a result, neither the Court nor creditors of GNG were notified of the terms of the 2004 Agreement or given an opportunity to determine whether the transaction was in the best interests of the estate.

---

3. The eighteen over the road locations include fifteen of the twenty-one stores serviced under the 2001 Agreement and three additional over the road stores. The other six stores serviced under the 2001 Agreement but not included in the 2004 Agreement were closed.

Brink's performed as required under the 2004 Agreement until the end of June 2004, when GNG sold substantially all its operating assets to Kum & Go, L.C., and notified Brink's to cease providing services. As of the end of June 2004, GNG has had no further need for armored transport services. Kum & Go, L.C. did not assume the 2004 Agreement or enter into a new contract with Brink's to service the stores it purchased from GNG. Brink's was and is ready, willing and able to continue to provide services under the 2004 Agreement.

Brink's invoiced GNG for services under the 2004 Agreement on a monthly basis in advance. GNG paid four monthly invoices (March 2004 through June 2004), compensating Brink's for all services actually rendered by Brink's, but GNG has refused to pay the eight remaining monthly installments that have become due or will become due under the 2004 Agreement. Thus, Brink's claims that GNG still owes $117,256[4] and asserts that figure as damages to which it is entitled by virtue of GNG's breach of the 2004 Agreement.

In July 2004, Brink's filed a proof of claim asserting its prepetition claims. The proof of claim is limited to a claim for the January 2004 installment of the 2001 Agreement in the amount of $10,990. GNG Exhibit 6. Brink's has not filed a proof of claim for damages resulting from the rejection of the 2001 Agreement.[5] The bar date for filing proofs of claim for rejection damages expired on July 31, 2004. See Order (A) Setting Bar Date for Filing Proofs of Claim Against Debtor and (B)

Approving Notice and Procedures Related Thereto (the "Bar Date Order"), ¶ 6 (Doc. 505).

Brink's employed eleven trucks to service GNG. As a result of GNG's directive to cease servicing GNG, Brink's has taken some of the trucks off the road and rerouted other trucks to service other customers. Brink's did not quantify the variable costs that it has saved by not servicing GNG, such as wages, gas and truck depreciation, but it has not made up for the total loss of revenue incurred as a result of the breach, although it has been able to use some trucks and employees to service new customers. Brink's built a twenty-five percent profit margin into its pricing. The remaining seventy-five percent of the monthly fee are generally applied equally to fixed and variable costs.

F & M claims a security interest in all of GNG's cash.[6] On June 25, 2004, the Court entered a cash collateral order authorizing GNG to use cash claimed by F & M, but only to the extent that F & M consents to such use. F & M Exhibit 1. F & M consented to the use of cash collateral only insofar as reflected on the budget attached to the cash collateral order. Even if Brink's administrative expense claim is allowed, F & M does not consent to the use of its collateral to pay the expense.

## IV. Conclusions of law

■ Generally, the burden of proving entitlement to a priority administrative claim is on the claimant, in this case, Brink's. See *Isaac v. Temex Energy, Inc.*

---

4. Brink's arrives at its damages figure by multiplying GNG's $14,657 monthly obligation by eight months.

5. Pursuant to 11 U.S.C. § 365(g)(1), such a rejection damage claim would be relegated to the status of a prepetition claim.

6. The issue of whether F & M's security interests in the cash collateral are valid, enforceable and unavoidable was not determined in the cash collateral order and those issues are the subject of a pending adversary proceeding. Brink's did not introduce any evidence to contest F & M's claim to the cash collateral, however.

*(In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir.1988). Brink's has met its burden of proving that GNG and Brink's entered into the 2004 Agreement that forms the basis of its administrative claim and the terms of the agreement.[7] GNG and F & M raise the defense that the 2004 Agreement is not enforceable due to a lack of notice to creditors and the absence of Court approval of the postpetition contract as required by 11 U.S.C. § 363(b) and/or Bankruptcy Rule 9019.

A. *Notice of the agreement was not required under 11 U.S.C. § 363(b)(1)*

GNG and F & M contend that the 2004 Agreement is unenforceable because the 2004 Agreement is a transaction outside "the ordinary course of business" and is thus a transaction requiring notice to creditors, a hearing and Court approval under 11 U.S.C. § 363(b)(1). Brink's contends that the transaction was an "ordinary course" event. Section 363(c) of the Bankruptcy Code permits a debtor in possession to "enter into transactions, including sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363(b)(1) states: "The trustee, after notice and a hearing, may use, sell, or lease, *other than* in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (emphasis added).

> The framework of section 363 is designed to allow a trustee (or a debtor in possession) the flexibility to engage in

ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary.... Creditors are not given the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the bankrupt's chapter 11 status, not the particular transactions themselves."

*In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir.1992) (citations omitted).

■ Liability for transactions entered into by a debtor in possession outside the ordinary course of business may be avoided if notice was not given to parties in interest and the transaction was not blessed by the Court as being in the best interests of the estate. *See Dalton Development Project # 1 v. Unsecured Creditors Committee (In re Unioil)*, 948 F.2d 678, 682–83 (10th Cir.1991); *In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 379 (Bankr.N.D.Okla.2004).

The contested issue is whether GNG's transaction with Brink's that resulted in the 2004 Agreement was "in the ordinary course of business" and therefore enforceable in absence of notice and a hearing, or whether the transaction was "other than in the ordinary course of business" and required notice and a hearing in order to become enforceable against the estate.

■ The Bankruptcy Code does not define the term "ordinary course of business." Generally, transactions in the "ordinary course of business" will "embrace

---

**7.** While Brink's also has the burden of proving the elements entitling its claim to administrative priority under 11 U.S.C. § 503(b)(1)(A) (*i.e.*, that the claim is for "actual, necessary costs and expenses of preserving the estate"), in light of the Court's conclusion that the contract under which Brink's claim arises is unenforceable, the Court need not address whether Brink's met its burden of establishing an administrative claim under Section 503(b)(1)(A).

the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business." *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir.1997) (internal quotations and citation omitted). "Where disputes arise as to a transaction's 'ordinariness,' courts typically apply two tests: the industry-wide test, sometimes called the 'horizontal test,' and the creditor's expectation test, sometimes called the 'vertical test.'" *In re Leslie Fay Cos.*, 168 B.R. 294, 304 (Bankr.S.D.N.Y.1994) (citations omitted).

■■■ "The horizontal test focuses on 'whether, from an industry-wide perspective, the transaction is the sort commonly undertaken by companies in that industry'." *Id.*, *quoting Roth American*, 975 F.2d at 953.[8] It is undisputed that convenience stores commonly employ armored transport services to ferry cash between stores and their designated banks on a regular, daily basis. Brink's representative testified that Brink's had contracts with other convenience store chains and that GNG had used Brink's services for over fifteen years. GNG had also em-ployed Loomis to provide the same type of services. Clearly GNG believed that it was necessary and in the best interests of the estate to continue to protect its revenue and employees by utilizing such security services during its reorganization because GNG's chief restructuring officer instructed Ron Ford to obtain new bids and enter into an agreement for services *before* rejecting the existing armored transport services contracts. Thus, the Court concludes that the 2004 Agreement satisfies the horizontal test for ordinariness.

■■■ The vertical, or creditor expectation test, "analyzes the transactions from the vantage point of a hypothetical creditor and [the inquiry is] whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Roth American*, 975 F.2d at 953 (internal quotations and citations omitted). "The primary focus thus is on the debtor's pre-petition business practices and conduct, although a court must also consider the changing circumstances inherent in the hypothetical creditor's expectations." *Id.* (internal quotations and citations omitted).[9]

8. Transactions in the following cases satisfied the horizontal test for ordinariness (although some transactions had features that failed the vertical ("expectation of creditors") test): *Roth American*, 975 F.2d at 953 (postpetition collective bargaining agreements are routinely entered into by manufacturing companies to secure uninterrupted services from their workforces and therefore such transactions are within the ordinary course unless their terms depart significantly from prepetition agreements); *Burlington Northern RR Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704–05 (9th Cir.1988) (postpetition renewal of leases of property that debtor had leased for eleven years and that its predecessor (in the same industry) had leased for the previous thirty years were ordinary transactions in the industry); *Leslie Fay*, 168 B.R. at 304 (it was not unusual for a garment manufacturing business to enter into a collective bargaining agreement with its relevant union).

The court in *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir.1997) concluded that "cancel[ation] of [a malpractice] insurance policy without opting for tail coverage" was a transaction that failed the horizontal test where the debtor/doctor was "practicing high risk laser surgery, facing a multitude of claims and ... lost the ability to generate income." *Id.* at 385.

9. Courts found transactions outside the ordinary course of business under the vertical test in *Lavigne*, 114 F.3d at 385 (hypothetical trade creditors and malpractice claimants would not expect the debtor (a doctor) "to cancel his malpractice insurance in light of the bankruptcy proceeding, the cessation of

In this case, GNG's prepetition practice was to enter into two to three year contracts for armored transport services, setting rates on a per store basis, with over the road locations commanding a higher rate than Tulsa metro locations. The terms of the 2004 Agreement do not deviate significantly from the terms of the 2000 Agreement or 2001 Agreement or from the terms of the Loomis Contract. Thus, the 2004 Agreement does not subject a hypothetical prepetition creditor to economic risks of a nature different than those accepted when the creditor decided to extend credit. A hypothetical creditor would expect and desire GNG to employ security services for the protection of employees and revenue and would expect that GNG would negotiate and lock in favorable rates for as long a period as prudent. The Court acknowledges that because GNG was attempting to reorganize and that it was possible that its reorganization might

fail (or the business might be sold), a hypothetical creditor might expect a shorter term for any services contract than was customary prepetition. A one year term is not so far beyond a creditor's reasonable expectations under the circumstances as to expel the 2004 Agreement from the realm of ordinary course.

GNG and F & M argue that "everyone knew" that GNG's reorganization strategy included selling the company or its operating assets to a third party as soon as possible, and therefore any contract with a term greater than month to month should be considered outside the ordinary course of business. In hindsight, this argument is appealing. However, at the time the 2004 Agreement was executed, no one could have accurately predicted that GNG would succeed in attracting a purchaser, obtain approval of a proposed sale, and close the sale and transfer the assets in a four

his medical practice and the outstanding [malpractice] claims against him"); *Roth American*, 975 F.2d at 953–54 (collective bargaining agreement was fundamentally different from previous agreements because it bound the debtor to maintain its operations and continue to provide work to union members); *Peltz v. Gulfcoast Workstation Group (In re Bridge Information Systems, Inc.)*, 293 B.R. 479, 486 (Bankr.E.D.Mo.2003) (in analyzing whether a settlement of a preference claim and other causes of action was "ordinary course," court found that "although it may have been customary for Debtor to settle its causes of action pre-petition, settlement of its claims do not occur frequently enough to deem them as 'ordinary' for the purposes of § 363(b)(1).... [A] reasonable creditor would have expected Debtor to seek court approval before entering into the Alleged Settlement Agreement"); *In re Crystal Apparel, Inc.*, 220 B.R. 816, 831–33 (Bankr.S.D.N.Y.1998) (even though golden parachute agreements are commonly bestowed upon management of large corporations, once a company is in bankruptcy, it is antithetical to the policies of the Bankruptcy Code, and therefore to the expectations of creditors, to commit a debtor in possession to a large administrative ex-

pense in favor of preferred insiders at the expense of creditors without notice); *Leslie Fay*, 168 B.R. at 304 (postpetition collective bargaining agreement ("CBA") was "fundamentally different from any prior agreement ... in that the [CBA] contains terms different from and whose magnitude greatly exceed any similar agreement" including "concessions [that] survive the expiration of the [CBA]," extensive and extraordinary job guarantees, and "settlement of all arbitration claims").

Transactions were found to satisfy the expectations of creditors test in *Dant & Russell*, 853 F.2d at 705 ("Because the postpetition leases are not an extraordinary business activity of debtor-in-possession, creditors reasonably would have expected it to continue its leasing activities, without requiring notice or a hearing"); *Crystal Apparel*, 220 B.R. at 831–33 (postpetition extension of management employee's contracts for one year was in the ordinary course of business because creditors should have expected that management's services would be required at least until confirmation, which the court and parties estimated would not occur for a minimum of six to nine months).

month period. Extraordinary efforts were undertaken to expedite the sale to Kum & Go, L.C., after it emerged as the successful bidder for the assets. During that four month period, GNG had the benefit of Brink's services at the reduced postpetition rates and it would have continued to have the benefit of the lower rates for up to a year if the sale had proceeded on a slower track. Moreover, although Kum & Go, L.C., decided not to assume the 2004 Agreement, a one year contract with favorable rates might have been attractive to another third party purchaser.

The Court finds and concludes that the 2004 Agreement is not fundamentally different from any of GNG's prepetition agreements for armored transport services, that the 2004 Agreement did not materially alter or increase the risk to creditors,[10] and therefore the transaction passes the vertical test for determining transactions in the ordinary course of business.

■ Because the Court concludes that the 2004 Agreement is an "ordinary course" transaction, notice of the transaction to parties in interest was not required under 11 U.S.C. § 363(b). The 2004 Agreement is therefore not unenforceable under Section 363(b) as urged by GNG and F & M.

### B. *Notice and approval were required under Bankruptcy Rule 9019*

■ Although the Court concludes that the transaction was similar to prior transactions entered into between GNG and Brink's and other armored transport ser-

vices, and was routine in the industry, and therefore no notice or Court approval was required under Section 363(b), Bankruptcy Rule 9019[11] imposes an independent basis for requiring Court validation of certain transactions, even if they prove to be ordinary. The Tenth Circuit Court of Appeals has held that "[u]nder Bankruptcy Rule 9019, a settlement or compromise agreement between the trustee and a party must be approved by the court, after notice and hearing, to be enforceable." *Travelers Ins. Co. v. American AgCredit Corp. (In re Blehm Land & Cattle Co.),* 859 F.2d 137, 141 (10th Cir.1988). *See also In re Pugh,* 167 B.R. 251, 253–54 (Bankr.M.D.Fla.1994). If the 2004 Agreement constituted a "compromise" or "settlement" by GNG of any outstanding claims by Brink's, then notice to creditors and Court approval are prerequisites to enforcement of the agreement. GNG and F & M contend that the 2004 Agreement constituted a compromise and settlement of Brink's claims arising under the 2001 Agreement.

The 2004 Agreement is not labeled a "settlement agreement," nor did the parties negotiating it characterize their transaction as a "settlement" or "compromise"; rather, they intended to create a new contract to expand the scope of Brink's service and provide GNG with a favorable rate package going forward. The parties' representatives believed the 2001 Agreement had been or would be rejected. It was not necessary to reject the 2001 Agreement, however, because it was canceled and terminated by the terms of the

---

10. GNG contends that the 2004 Agreement increased the number of stores to be serviced by Brink's by adding the Tulsa metro locations. This insight ignores the fact that Loomis had been providing services to all stores prepetition and had been paid for such services and that GNG would have engaged and

paid some armored transport services company to service all the stores in any event.

11. Bankruptcy Rule 9019 states that "[o]n motion by the trustee and after a notice and a hearing, the court may approve a compromise or settlement."

2004 Agreement. Paragraph X(6) of the 2004 Agreement specifically provides that "[t]his Agreement and the applicable Schedules, exhibits, attachments and/or riders that are incorporated herein by reference, all as may be amended from time to time, constitute the entire agreement between Customer and Brink's with respect to the subject matter hereof and *supersede and cancel any and all prior and/or contemporaneous offers, negotiations, promises, exceptions and understandings, whether oral or written, express or implied between the parties.*" Brink's Exhibit 1, ¶ X(6). The 2004 Agreement included all the over the road stores that were still operating, which were the precise subject matter of the 2001 Agreement. Thus, the 2001 Agreement was superseded and canceled by the terms of the 2004 Agreement. As a result, GNG's obligation to pay the remaining four and one-half monthly payments during the remaining term of the 2001 Agreement was canceled, compromising Brink's potential rejection

claim of approximately $57,000 which was still due on the 2001 Agreement. In addition, Brink's offered GNG rates on the over the road locations that were substantially lower than the rates required under the 2001 Agreement. In exchange for these concessions by Brink's, Brink's obtained a one year commitment from GNG to service more stores, including the Tulsa metro locations that were the subject of the Loomis Contract.

Pursuant to Bankruptcy Rule 9019, creditors and the Court should have been given notice and the opportunity to determine whether the compromise of the 2001 Agreement (combined with the rejection of the Loomis Contract) was favorable to or in the best interests of the estate. Since no notice of the compromise or opportunity for hearing was afforded to creditors of the estate, the Court has no choice but to follow the holding by the Tenth Circuit Court of Appeals in *Blehm Land & Cattle Co.* and declare the 2004 Agreement unenforceable.[12]

**12.** Although Bankruptcy Rule 9019 limits the party who may request approval of a compromise to the trustee (or debtor-in-possession), it does not impose a *duty* on the trustee to do so. In this case, for whatever reason, GNG did not bring the compromise to the attention of the Court or creditors but GNG did take advantage of the terms of the 2004 Agreement for four months to obtain security services at favorable rates before repudiating the agreement. The notice requirements of 11 U.S.C. § 363(b) and Bankruptcy Rule 9019 are designed to protect creditors of the estate from financially unwise or overreaching postpetition transactions made by an operating debtor which would affect the creditors' ability to realize a distribution on their prepetition claims. *See Blehm Land & Cattle,* 859 F.2d at 140 ("ex parte ... agreements should receive close scrutiny from the court"). Notwithstanding the policy of protecting creditors, however, the Court is troubled by the repercussions that could result from allowing debtors to renounce agreements under which the debtor (and its creditors) have already reaped the benefit on the ground that the debtor

failed or refused to give notice and seek approval of the agreement under Bankruptcy Rule 9019 or 11 U.S.C. § 363(b). Specifically, the Court is concerned with the unfairness, perceived and actual, to innocent or naive third parties who venture to deal with a chapter 11 debtor, especially in transactions which would, absent the existence of a technical "compromise," otherwise be deemed to be ordinary course transactions, and the disincentive this inequitable result will produce for third parties to deal with a reorganizing debtor. Decisions like this one may ultimately increase the cost of reorganizing, if parties dealing with a chapter 11 debtor are forced to protect themselves by requiring as a condition of *any* postpetition contract or transaction, no matter how routine, that the debtor seek and obtain Bankruptcy Court approval. The best practice is to insure that representatives of a chapter 11 debtor with authority to bind the debtor to postpetition contracts are educated by debtor's counsel regarding the boundaries and requirements of 11 U.S.C. § 363 and Bankruptcy Rule 9019, and that they are instructed to submit postpetition contracts that

■ Because the 2004 Agreement is unenforceable against the estate, the estate likewise may not retain the benefits of the unapproved compromise. Accordingly, the Court concludes that the cancellation of the 2001 Agreement by the 2004 Agreement is also unenforceable and the estate cannot escape the liability, if any, that arose from the attempted rejection of the 2001 Agreement. The Bar Date Order provided that creditors with claims arising out of the rejection of an executory contract were required to file claims by the later of July 31, 2004 or thirty days after the entry of an order approving the rejection. Although an order approving the *purported* rejection of the 2001 Agreement was entered on March 30, 2004, that order was a nullity in light of the 2004 Agreement. Since the 2004 Agreement has now been declared unenforceable, this order will be deemed to be an order approving the rejection of the 2001 Agreement and Brink's shall be afforded thirty days from the date of this order in which to file its rejection claim, if any.[13]

## V.  Conclusion

The Motion is denied. This Order constitutes an order approving the rejection of the 2001 Agreement and Brink's has thirty days in which to file a rejection claim, if any.

---

purport to commit the debtor to any substantial term or financial obligation to debtor's counsel to review for elements that might require notice and Court approval.

**13.**  Nothing in this Order shall be construed as a finding of the validity, extent or amount of any rejection claim Brink's may assert against the estate.