**In re ST. LOUIS GLOBE–DEMOCRAT, INC., Debtor.**

**Bankruptcy No. 85–01605(2).**

United States Bankruptcy Court, E.D. Missouri, E.D.

May 18, 1988.

David A. Sosne, Clayton, Mo., for Trustee.

William L. Brinson, Edwardsville, Ill.

Richard O. Erdmann, Fairview Heights, Ill.

Charles D. Burgess, Bethalto, Ill.

John Rudy, St. Louis, Mo.

Frank Lundak, Glendale Heights, Ill.

Frank Renkins, St. Louis, Mo.

Janna Hick, Glendale Heights, Ill.

Roger McGrath, St. Louis, Mo.

Daryl Stephenson, St. Louis, Mo.

Cathy A. Cullen, Granite City, Ill.

James A. Carey, St. Louis, Mo.

Edward S. Sedej, Granite City, Ill.

T.V. Vessell, Festus, Mo.

David R. Gaumer, Decatur, Ill.

Richard P. Stankoven, St. Louis, Mo.

William J. Bradley, St. Louis, Mo.

Robert L. Lowes, St. Louis, Mo.

Robert G. Barker, St. Louis, Mo.

Daniel Caesar, St. Louis, Mo.

Lucyann Boston, Webster Groves, Mo.

Constance J. Conroy, St. Louis, Mo.

Leslie W. Pearson, Ellisville, Mo.

Morrison J. Levin, St. Louis, Mo., for the Guild.

Robert A. Steinke, St. Louis Newspaper Guild Local No. 47, TNG, St. Louis, Mo.

William Howard, St. Louis, Mo. for petitioning creditors.

Steven N. Cousins, St. Louis, Mo.

Gerald A. Rimmel, Clayton, Mo. for debtor.

Gregory D. Willard, St. Louis, Mo.

Leslie A. Davis, Clayton, Mo.

Lloyd A. Palans, Clayton, Mo. for Veritas.

Michael Wetmore, Clayton, Mo.

Irvin A. Friedman, St. Louis, Mo. for Creditors Committee.

## MEMORANDUM AND ORDER

DAVID P. McDONALD, Bankruptcy Judge.

### INTRODUCTION

Pending for determination are the objections lodged by the Chapter 7 Trustee to the claims of Debtor's former employees for wages, vacation and severance pay. For the reasons stated below, the Trustee's objections will be OVERRULED.

### BACKGROUND

For many years, the St. Louis Globe–Democrat (the "Globe") was in the business of publishing newspapers in the St. Louis, Missouri metropolitan area. During late 1983 and early 1984, the then owner of the newspaper, The Herald Company, negotiated with and sold the Globe to Gluck Media, Inc. ("Gluck"). When Gluck assumed ownership of the Globe around February 25, 1984, he retained a number of the Globe's employees. During Gluck's ownership the Globe and St. Louis Newspaper Guild Local No. 47 (the "Guild") became parties to a collective bargaining agreement (the "Agreement"). The Agreement was executed as of June 17, 1985 and was to remain in effect until December 31, 1988. *See*, this Court's Order of September 18, 1985, Motion 002. Articles IV and V of the Agreement govern severance and vacation pay. The Articles are reproduced in their entirety in the Appendix attached hereto.

On August 19, 1985, the Globe was the subject of an involuntary bankruptcy petition. On September 26, 1985, the Globe consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code and continued operating thereunder until publication ceased on December 16, 1985. On December 9, 1985, Edwin Jones was appointed Operating Trustee under Chapter 11 and on December 31, 1985, the Court approved the sale of substantially all of the Globe's assets to Veritas Corporation. On December 23, 1986, the case was converted to Chapter 7 and Curtis L. Mann was appointed Trustee. At no time did either the Debtor or its respective Trustees move to reject the Agreement.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of

Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(B), which the Court may hear and determine.

DISCUSSION

Former Globe employees have filed claims for wages, vacation and severance pay for the period from September 26, 1985, the date relief was ordered, through December 16, 1985, the date operations ceased.[1] These employees take the position that their claims should be treated as expenses of administration entitled to priority under Title 11, Section 507(a)(1), which provides that first priority shall be given to claims for "Administrative Expenses" allowed under § 503(b). These administrative expenses are set forth in § 503(b)(1)(A):

> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

I. WAGES

■ Although the Trustee filed numerous objections to employee claims, his position as to the employees' base wages, which accrued between September 25 and December 16, 1985, is that they should be allowed as expenses necessary to the preservation of the estate. The Court agrees with this position since it is patent that without the sacrifice, loyalty and hard work of the Globe employees, the paper would have met an even earlier demise.

II. SEVERANCE PAY

■ The Trustee's position with respect to severance pay accords with his view on vacation pay, namely, that severance pay is allowable as an administrative expense only to the extent that it is earned during the Chapter 11 administration. Since the Agreement provides that six months continuous employment is a condition for earning severance pay and since the Chapter 11 administration lasted less than six months, the Trustee concludes that no Globe employees are entitled to severance pay as an administrative expense.

For a number of reasons, the Court rejects the Trustee's argument. First, while six months continuous employment is a condition for severance pay, it does not follow that because the Chapter 11 administration lasted less than six months, that no employee satisfied that condition. Such a conclusion must rest, if at all, on the discredited theory that a Chapter 11 debtor is a wholly new entity and that, therefore, the employment relation commenced anew with the filing of the case. Instead, this Court concludes that "it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing." *NLRB v. Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984). Therefore, whether an employee is entitled to severance pay must be determined by looking at the first date from which the employee continuously worked for the Globe. If that date is more than six months prior to December 16, 1985, the date publishing operations ceased, then the severance pay condition is satisfied.

■ Second, while a number of courts have held that severance pay is earned from day to day and, thus, entitled to payment as an administrative expense only for the period of the Chapter 11 administration, *Matter of Health Maintenance Foundation*, 680 F.2d 619 (9th Cir.1982); *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976); *In re Public Ledger*, 161 F.2d 762 (3rd Cir.1947), this Court agrees with the Second Circuit that:

> "Severance pay is not earned from day to day and does not 'accrue' so that a proportionate part is payable under any cir-

---

**1.** The same employees also have such claims for the pre-bankruptcy period, namely, before August 19, 1985, and for the involuntary gap period, after August 19, 1985, the date of the involuntary petition, and before September 26, 1985, the date relief was ordered. Since it appears that no funds will be available to pay such claims, the Court offers no opinion respecting their merits at this time.

cumstances. After the period of eligibility is served, the full severance pay is due whenever termination of employment occurs. Severance pay is

'a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense him for certain losses attributable to the dismissal.' *Adams v. Jersey Central Power & Light Company*, 21 N.J. 8, 13–14, 120 A.2d 737, 740 (1956)."

*Straus–Duparquet, Inc. v. Local U. No. 3*, 386 F.2d 649, 651 (2d Cir.1967); *see also, In re W.T. Grant Co.*, 620 F.2d 319 (2d Cir. 1980), *cert. denied*, 446 U.S. 983, 100 S.Ct. 2963, 64 L.Ed.2d 839 (1980). Thus, under this theory the former Globe employees are entitled to all severance pay due them under Article IV of the Agreement.

Third, even if the Court agreed with the general proposition that severance pay is earned from day to day, where, as here, the collective bargaining agreement has been *assumed* by operation of law, the Court shall look only to the Agreement itself to determine the amount of the employee's damages due as an expense of administration. In short, the Court holds that the same principle which governs the determination of vacation pay also applies to severance pay.

## III. VACATION PAY

■ The Chapter 7 Trustee, while agreeing that the wages are an administrative expense, objects to any such allowance for severance pay. Considering the question of vacation pay, the Trustee agrees with the position stated in *Straus–Duparquet, Inc., supra*, 386 F.2d 649, 650–51 (2d Cir. 1967) that "claimants are entitled to priority for vacation pay as an expense of administration only to the extent of the proportionate part of total vacation pay earned during the period from the beginning of the bankruptcy administration to the date of termination of employment."

The Trustee's position, however, fails to account for the effect of Title 11, Section 1113. That Section sets forth certain procedures which a debtor in possession or trustee must follow in order to reject a collective bargaining agreement. Section 1113(f) specifically provides that "no provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." According to the leading treatise on bankruptcy, Section 1113(f) reversed *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) to the extent that it held:

"that a trustee or debtor in possession was not legally bound to a collective bargaining agreement subsequent to the filing date and prior to the court determination of the application for authority to reject such agreement. The trustee or debtor in possession must adhere to the terms of the collective bargaining agreement unless the court approves the application for rejection pursuant to section 1113(c) or grants interim relief under section 1113(e)." 5 *Collier On Bankruptcy*, ¶ 1113.01[4][b] (15th Ed.1987).

Since neither the Debtor nor either of its respective trustees ever moved to reject the Agreement, under Section 1113(f) the Agreement and all the terms and conditions thereof must be considered to have been at all relevant times binding upon the Debtor and its estate. Article V, paragraph 2 provides for the payment of vacation pay upon termination of employment. In the instant case, the employees are entitled to full vacation compensation pay for the entire period of their employment as provided by Article V, paragraph 2 of the collective bargaining agreement. In most cases, vacation pay is earned from day to day over a long period of time and the employee would be entitled to receive an administrative priority payment pursuant to § 503(b)(1)(A) for the vacation pay accrued only during the administrative period. However, in this case the vacation pay accrues under a provision of termination schedule found in Article V of the collective bargaining agreement. Thus, under these circumstances, both the right to receive *total* sev-

erance pay and *total* vacation pay arise as a result of termination and are entitled to payment as an administrative expense.

In addition, even if the collective bargaining agreement did not provide a schedule for vacation pay upon termination, it is undisputed that the Agreement has not been performed with respect to either vacation or severance pay. The question, therefore, is what remedy the Globe's former employees have by reason of that breach of the Agreement.

While there are no cases construing Section 1113(f), closely parallel is the situation where a debtor breaches an executory contract previously assumed. As the Supreme Court stated in *Bildisco*, "should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere, In re Italian Cook Corp.*, 190 F.2d 994, 996 (CA3 1951), and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate, 11 U.S.C. § 503(b)(1)(A) (1982 ed.)" 465 U.S. at 531–32, 104 S.Ct. at 1199. In that event, damage claims are granted an administrative expense priority limited as to amount only by the contract itself and state law. *See, In re Multech Corp.*, 47 B.R. 747 (Bankr.N.D.Iowa 1985); *See also, Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (those injured during the administration of an estate by the trustee are entitled to priority claim as an administrative expense). If that principle were followed, *all* vacation pay due the Globe employees in accordance with Article V, paragraph 2 of the Agreement would be allowed as an expense of administration, not just the amount earned from September 26, 1985 through December 16, 1985, the period of the Chapter 11 administration.

▮▮ Of course, in the case at bar the Agreement was never formally assumed. Arguably, therefore, the inference could be drawn that since it was never rejected after having been assumed, damages for breach of the Agreement should not be accorded an administrative expense priority. Such an inference, however, would be mistaken because by requiring adherence to all terms of a collective bargaining agreement until rejection, Section 1113(f) by operation of law (and, therefore, without the need for a formal motion) effects assumption of such an agreement. That is until the Court approves the rejection of the collective bargaining agreement, it continues in effect. As previously noted, it is undisputed that the Agreement was not performed by the Debtor and/or Trustees with respect to either vacation or severance pay. That being the case, the Court concludes that the former Globe employees are entitled to their vacation pay as an expense of administration in the amounts provided by Article V, paragraph 2 of the Agreement.[2]

## CONCLUSION

To recapitulate, for each former employee of the Globe, allowable as an administrative expense under Title 11, Section 503(b)(1)(A) and entitled to priority under Title 11, Section 507(a)(1) are the unpaid wages for the period of the Chapter 11 administration, namely, September 26, 1985 through December 16, 1985, together with vacation and severance pay as provided for in Articles IV and V of the Agreement.

IT IS THEREFORE ORDERED that the Trustee's objections to the payment of such claims are OVERRULED; and

IT IS FURTHER ORDERED that on or before June 10, 1988 Trustee submit a proposed Order liquidating said claims consistent with the principles stated herein.

## APPENDIX

### ARTICLE IV

### DISMISSAL PAY

1. (A) When an employee is dismissed otherwise than as a result of his own willful breach of duty or willful misconduct, or where the dismissal was self-provoked, he

---

**2.** The starting point for calculating vacation pay should be the date the employee was first hired by Gluck, the Herald Company, or any of its predecessors, whichever is earlier, so long as the employee's employment with the Globe was continuous throughout the period.

shall be compensated in addition to the sum otherwise due him one (1) week's pay for each six (6) months' last continuous employment by the Publisher to a maximum of sixty-six (66) weeks in dismissal pay.

(B) Willful breach of duty or willful misconduct is defined as constituting a theft from the Publisher or on the Publisher's premises or willful disclosure of confidential information of major importance or failure to become or remain a member of the Guild in good standing.

2. The amount of the weekly dismissal compensation shall be computed only on continued and uninterrupted service with the Publisher, except that absence on military leave shall not be considered to be an interruption of an employee's service with the Publisher. Dismissal compensation shall be computed at the highest weekly wage (excluding any night differential payment) received by the employee within the previous twelve (12) months; or in the case of an employee receiving a wage and commission it shall be based on the highest weekly wage received by the employee within the previous twelve (12) months plus the average weekly commission for the previous twelve (12) months. From such dismissal pay the Publisher may deduct any levy or tax to which the employee is subject under any City, State or Federal Law.

## ARTICLE V

### VACATIONS

1. (A) Employees shall receive annual vacations with full pay according to the following schedule: One week's vacation after six months of continuous employment; two weeks' vacation after one year's continuous employment; three weeks' vacation after two years' continuous employment; four weeks' vacation after five years of continuous employment, and five weeks after twenty years of continuous employment.

(B) Determination of eligibility for vacation shall be based on the anniversary of the individual's last employment by the Publisher. The vacation period will extend from April 1 to March 31. The Publisher agrees to post vacation schedules for claiming by February 1. Employees with eight (8) or more years' seniority are to make their vacation selections in writing, giving the Publisher their first choice, second choice, and third choice of dates by February 15. Employees with less than eight (8) years' seniority are to make their vacation selections in writing, also giving first, second and third choices of dates by March 1. Requests for split vacations are to be made at the same time. The list of assigned vacations will be posted by March 15. Once assigned, a vacation period, or periods, cannot be changed, altered, or exchanged with another employee, except with the approval of the Publisher.

2. In the event of termination of employment, an employee shall receive accrued vacation pay for each month of service following the last previous anniversary date of employment according to the following schedule:

Less than 6 months' service—.833 of a day per month of service but not more than 5 days.

More than 6 months but less than 5 years—1.25 days per month of service.

More than 5 years but less than 20 years —1.666 days per month of service.

More than 20 years—2.083 days per month of service.

3. Vacation pay for all employees shall be defined as straight time pay, exclusive of overtime, plus night differential for those employees who work a night differential shift more than 90% of their anniversary years. Classified Telephone Representatives and Outside Classified Sales Representatives in addition shall receive during their vacations the commissions in their regularly assigned territories during their vacation periods. Similarly, alternate Classified Telephone Representatives shall receive during their vacations, in addition, weekly sums representative of their average weekly commissions previously earned.

4. (A) Employees may be called back to work during vacations only in case of extreme emergency. For any day of vacation on which an employee is called back to work, he shall have the choice: 1) of giving

up from his vacation the time worked and receiving two (2) extra days' pay for each day worked in addition to his vacation pay; or 2) two (2) other days off in the future, or added to his vacation, for each day worked. Travel time during the workday described in Article III, Section 3, and which is occasioned by the call-back if the call-back results in the employee traveling from another city to St. Louis, shall be considered working time. Travel costs incurred in such a call-back shall be paid by the Publisher, including round trip back to the vacation point but only if the employee returns to the vacation point.

(B) Where an employee by his choice changes a vacation schedule which had been previously arranged with Publisher and where an employee has been advised that such change is impractical and then while this employee is on vacation it becomes necessary to call this employee back to work the terms of Article V, Section 4(A) will not apply.

5. (A) Vacations shall not be taken until after the anniversary of employment on which employees earn their respective vacation credits. The One (1) week vacation earned after six (6) months of employment shall be scheduled and used promptly after having been earned and in no event later than five (5) months after having been earned. All other vacations must be scheduled and used within twelve (12) months following the anniversary date on which the credits were earned. If at the end of nine (9) of these twelve (12) months, the employee has not taken, or scheduled, his vacation the Publisher has the right to schedule it during the remaining three (3) months. Vacations not scheduled by the employee or assigned by the Publisher during the twelve (12) months following the anniversary date on which the vacation credits were earned, or the one (1) week earned after six (6) months, shall be scheduled by the employee during the second anniversary year.

(B) The Publisher has the right to determine the number of employees who may be off on vacation at any one time. In case of conflict among employees in selection of dates seniority of service with the Publisher shall prevail subject to the operating requirements of a department.

6. Employees shall be granted split or winter vacations upon request, where practical. Employees will not be required to take split vacations. When an employee has split his vacation but has not scheduled the remainder of his vacation under the terms of Section 5 of this Article V the Publisher may assign a vacation period to the employee in the final three (3) months of an employee's 12–month period.