In re IONOSPHERE CLUBS, INC., Eastern Air Lines, Inc., and Bar Harbor Airways, Inc., d/b/a Eastern Express, Debtors.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, International Association of Machinists and Aerospace Workers, and Transport Workers Union, Appellants,

v.

Martin R. SHUGRUE, Jr., Trustee for the Estate of Eastern Air Lines, Inc., Appellee.

No. 91 Civ. 6897 (MBM).

United States District Court, S.D. New York.

May 24, 1993.

Joseph L. Manson, III, John P. Campbell, Douglas W. Hall, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, DC, for appellee.

Richard M. Seltzer, Mary T. Connelly, Cohen, Weiss & Simon New York City, for appellant Air Line Pilots Ass'n, Intern.

Joseph Guerrieri, Jr., Robert S. Clayman, Guerrieri, Edmond & James, P.C., Washington, DC, for appellant Intern. Ass'n of Machinists and Aerospace Workers.

Malcolm A. Goldstein, O'Donnell & Schwartz, New York City, for appellant Transport Workers Union.

## OPINION AND ORDER

MUKASEY, District Judge.

The Air Line Pilots Association ("ALPA"), the International Association of Machinists and Aerospace Workers ("IAM"), and the Transport Workers Union ("TWU") ("the unions"), appeal from the September 10, 1991 decision of the bankruptcy court (Lifland, C.J.), classifying prepetition vacation pay claims as in part general unsecured claims and in part third priority claims pursuant to 11 U.S.C. § 507. The unions argue that because those claims arise from collective bargaining agreements, they are governed by the terms of 11 U.S.C. § 1113, which they contend supersedes the priority scheme of § 507. The Trustee for the debtor Eastern Airlines ("EAL") argues, and the bankruptcy court determined, that §§ 1113 and 507 are not in conflict because the priority scheme of § 507 does not force a unilateral termination or modification of the collective bargaining agreement, as prohibited by § 1113(f), and therefore the claims are properly classified under § 507 as at best third priority. ALPA also claims that the bankruptcy court erred in failing to order Eastern to arbitrate with ALPA over the

interpretation of the vacation pay provisions for certain pilots. For the reasons stated below, the decision of the bankruptcy court is affirmed.

### I.

ALPA represents all airline pilots formerly employed by Eastern. IAM represents former Eastern ground services personnel. TWU represents all former Eastern flight attendants. (Unions' Mem. at 5)

On March 9, 1989, Eastern filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy court then appointed Martin Shugrue as trustee for the debtor. On January 18, 1990, Eastern ceased operations. (Gibson Decl. ¶ 2) Accordingly, this is a liquidating and not a reorganizing Chapter 11.

The parties are governed by collective bargaining agreements, entered into pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1988), specifying, among other things, the terms of vacation pay. The most recent collective bargaining agreements between Eastern and the respective unions were adopted February 1986 with ALPA, May 1985 with IAM, and in 1988 retroactive to 1986 with TWU. (Gibson Decl., Exhs. A, B & C)

The vacation pay agreements provide that employees accrue vacation throughout a year and earn the right to take it or be paid for it on January 1 of the following year. (Gibson Decl. ¶ 3) If an employee leaves the company, he or she has a right to be paid fully for all vested vacation not taken. (Gibson Decl. ¶¶ 4–8) The prepetition vacation pay claims of the unionized employees total $61.7 million. (Tr. at 5)

Additional provisions regarding vacation pay in the ALPA/EAL agreement are relevant here. The estates of pilots who die, and pilots who retire or are furloughed in a given year are entitled not only to vacation pay earned for the previous year as of January 1 of the year of separation, but also to all vacation pay accrued until the actual date of separation, notwithstanding that such pay normally would not vest until January 1 of the following year. (Gibson Decl. ¶ 4 & Exh. A, §§ 16F & 40E)

### II.

Section 1113 of the Bankruptcy Code protects employees covered by collective bargaining agreements from the unilateral termination or modification of those agreements by debtor-employers; it requires the debtor to follow certain procedures and to obtain court approval before making changes in working conditions. The protections of § 1113 have led to conflicts with earlier enacted sections of the Code, especially the priority scheme of § 507.

Section 1113 was enacted in response to the decision of the Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). There the Court held that a collective bargaining agreement is an executory contract, and then divided 5–4, holding that a debtor does not commit an unfair labor practice if it repudiates the agreement without first obtaining the approval of the bankruptcy court. Congress enacted § 1113 five months later, requiring that a debtor-employer confer with the union and that the bankruptcy court approve any rejection of the labor agreement. *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991) (*"Ionosphere I"*); *In re Unimet Corp.*, 842 F.2d 879, 881–82 (6th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988).

Section 1113 provides in relevant part that "(a) ... the trustee ... may assume or reject a collective bargaining agreement only in accordance with the provisions of this section." It requires the trustee, prior to seeking rejection of the collective bargaining agreement, to make a proposal to the authorized representative of the employees, to provide all relevant information to the representative to aid in evaluation of the proposal, and to meet with the representative. A court may approve rejection of the collective bargaining agreement only if these requirements have been met.

Section 1113(f) then states that "[n]o provision of this title shall be construed to

permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." It is the effect of this provision on the payment of the claims of unionized employees that is at issue here.

The bankruptcy judge was of the view that "[s]ection 1113(f) is a very, very short, succinct, simple statute, and if you look at that literally, I do not see in any way that the Trustee here seeks to unilaterally change or terminate the terms of the collective bargaining agreement." (Tr. at 28) Therefore, he found § 1113(f) inapplicable, and analyzed the pay claims according to § 507.

The bankruptcy court classified the unions' vacation pay claims pursuant to § 507 of the Code, which provides in relevant part:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title

. . .

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2000 for each such individual.

Chief Bankruptcy Judge Lifland found that the employees' prepetition vacation pay claims were at best third priority claims, because they did not meet the criteria for administrative expenses. Section 503(b)(1)(A) defines "administrative expenses" as "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered *after* the commencement of the case." (emphasis supplied). The vacation pay claims arise from work before the commencement of the case.

In defining which pay claims fall within the provisions of subsection 507(a)(3), the bankruptcy judge found that pay earned within 90 days of the filing did not include the full previous year's pay that had accrued throughout the year and vested under the terms of the contract on January 1, 1989, which was within the 90 day period before March 9, 1989, the filing date. Rather, the bankruptcy judge held that only vacation pay earned for work actually performed within the 90-day period qualified for inclusion as a third priority claim. That ruling relied on the holding in *In re Northwest Engineering Co.*, 863 F.2d 1313 (7th Cir.1988), that pay is "earned" within the meaning of § 507(a)(3) as work is done, regardless of the specific vesting mechanism in the labor agreements. I find the reasoning of the Seventh Circuit in *Northwest Engineering* persuasive, even though the opinion suggests that that court's reading of § 507 was influenced by the fact that the filing in that case was more than 90 days after the vesting date. *Id.* at 1318. As the court pointed out, that circumstance would have resulted in a complete denial of benefits to union employees unless the section were read to mean that pay is earned as work is done. *Id.* The bankruptcy judge treated all other vacation pay claims as general unsecured claims.

*Northwest Engineering* did not treat the issue of whether § 1113 overrides § 507, but dealt only with the way § 507 applies. The unions here argue that § 507 does not apply, and therefore *Northwest Engineering* is also inapplicable, and have chosen instead to base their appeal on the assertion that the entire amount of vacation pay owed union employees under the terms of the various collective bargaining agreements is payable as a superpriority under § 1113(f). The unions argue that the court must go outside the legislatively established priority scheme of § 507 in order to fulfill § 1113's mandate to protect collective bargaining agreements, and accord the unions' claims at least equivalent priority to administrative expenses under § 503(b).

Thus, the question is whether judicial application of the priority scheme of § 507 constitutes a unilateral termination or alteration of the provisions of the collective

bargaining agreement by the trustee as contemplated by § 1113, and whether the granting of "superpriority" status to all unrejected pay claims is an appropriate method of enforcing the protections of § 1113.

■ The bankruptcy court's factual determinations are binding unless clearly erroneous, but its conclusions of law are to be reviewed *de novo*. *Ionosphere I*, 922 F.2d at 988–89; *In re Financial News Network, Inc.*, 126 B.R. 152, 154 (S.D.N.Y. 1991).

### III.

■ Several circuits have considered the effect of § 1113 on other sections of the Code and reached potentially conflicting decisions. The Second Circuit has held in a previous appeal in the Eastern bankruptcy that § 1113 trumps other sections of the Code in certain circumstances, although it has not considered the interaction of §§ 1113 and 507. *Ionosphere I*, 922 F.2d 984. The Sixth Circuit considered the relationship between § 1113 and § 507 and awarded a "superpriority" to claims for retiree benefits under an unrejected collective bargaining agreement. *Unimet*, 842 F.2d 879. However, the Third Circuit specifically considered the issue of vacation pay claims and applied the priority scheme of § 507, rather than giving such claims superpriority under § 1113. *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir.1992).

The Second Circuit has held that § 1113(f) precludes application of some sections of the Bankruptcy Code only in particular circumstances, not across the board. *Ionosphere I*, 922 F.2d 984. The rationale for that approach is the principle of statutory construction which holds that "[w]hen two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 1993–94, 48 L.Ed.2d 540 (1976).

Nonetheless, the Court found that:

Subsection 1113(f) evinces an intent that other provisions of the Bankruptcy Code are inoperable to the extent that they allow a debtor to bypass the require-

ments of § 1113. The language of the statute indicates that Congress intended § 1113 to be the sole method by which a debtor could terminate or modify a collective bargaining agreement and that application of other provisions of the Bankruptcy Code that allow a debtor to bypass the requirements of § 1113 are prohibited.

*Ionosphere I*, 922 F.2d at 989–90.

However, the Court declined to articulate a general rule defining termination or modification. Rather, the Court held that:

Section 1113(f) is circumstance specific rather than section specific. Congress did not choose to direct § 1113(f) at any specific provision whose application it deemed would always permit a debtor unilaterally to alter a collective bargaining agreement. Rather, § 1113(f) presumes a particularized determination in any circumstance as to whether the application of another provision of the Bankruptcy Code will permit a debtor unilaterally to terminate or alter a collective bargaining agreement.

*Id.* at 991.

The Court considered the application of the automatic stay provision of 11 U.S.C. § 362 to two different provisions of the collective bargaining agreement: 1) a prohibition on wet-leasing—the leasing of aircraft and crews from another airline, and 2) a provision for arbitration to determine whether labor protective provisions in the collective bargaining agreement had been triggered, in this case by Eastern's merger with Continental. The Court held that § 1113(f) overcomes the automatic stay as to the arbitration clause, but not as to the wet-lease clause—*i.e.*, that arbitration must proceed unless and until the contract is rejected in accordance with § 1113, but that proceedings to enforce a clause that barred wet-leasing were automatically stayed by the filing of the bankruptcy petition. In so deciding, the Court cautioned that it was considering simply the "very specific question of congressional intent as to 362 in enacting 1113." *Id.*

The Court held that § 1113(f) meant there was no automatic stay of an arbitration required by the collective bargaining agreement, but the stay did halt an action by the unions in United States District Court in the Southern District of Florida to enjoin the wet-leasing of aircraft to replace Eastern's aircraft grounded by striking crew members. It allowed the stay against the wet-leasing suit because that issue could be adjudicated in bankruptcy court. The Court found that such a result substantially enforced collectively bargained rights while protecting the coherence and efficiency of the bankruptcy process, as intended by the automatic stay provision of § 362. *Id.* at 993. However, the Court suggested that if the bankruptcy court would not hear the action for an injunction, the bankruptcy judge would have to allow the action to proceed elsewhere.

As to the arbitration clause, the Court held that § 362 could not stay its implementation unless Eastern complied with the repudiation procedures of § 1113. *Id.* at 992. That decision resulted in part because "[t]he federal judiciary and Congress both have recognized the importance to the collective bargaining process of arbitration." *Id.* "We conclude … that Congress intended that a collective bargaining agreement remain in effect and that the collective bargaining process continue after the filing of a bankruptcy petition unless and until the debtor complies with the provisions of § 1113." *Id.* at 990. The Court's concern about preserving the integrity of the collective bargaining process through respect for the arbitration provisions stemmed from decisions emphasizing the need to prevent recourse to bankruptcy as a method for ridding a company of a union, and also because the private collective bargaining process might better resolve certain issues than would a bankruptcy court. *Id.* (citing *In re Century Brass Prods.*, 795 F.2d 265, 272 (2d Cir.1986) (§ 1113 "created an expedited form of collective bargaining with several safeguards

designed to insure that employers did not use Chapter 11 as medicine to rid themselves of corporate indigestion"); *In re Mile Hi Metal Sys., Inc.*, 51 B.R. 509, 510 (Bankr.D.Colo.1985) ("[o]ne of the primary purposes of [§ 1113] was to emphasize the private collective bargaining process in an effort to avoid recourse to the bankruptcy court")).

Following the decision in *Ionosphere I*, this District has considered the issue of the priority of vacation pay claims under a collective bargaining agreement in *In re Golden Distributors, Ltd.*, 152 B.R. 35 (S.D.N.Y.1992), in which the court read *Ionosphere I* to mean that § 1113 supersedes § 507 as applied to vacation pay claims. However, in view of the Second Circuit's warning in its opinion in *Ionosphere I* that it was considering the interaction of § 1113 with § 362's automatic stay provisions only, and that courts always should perform such section-specific, circumstance-specific analysis in deciding the effect to give § 1113, I decline to follow the reading of *Ionosphere I* in *Golden Distributors* to articulate a broad rule "not consistent with congressional intent at the time" of enactment of § 1113, and suffering "perhaps some logical difficulty," but nonetheless requiring superpriority status for prepetition vacation pay claims. Rather, the Second Circuit's previous opinion in this bankruptcy creates a framework within which section-specific, circumstance-specific analysis should be performed.

The unions argue that this court should follow the Sixth Circuit's opinion in *Unimet*, 842 F.2d 879, and reverse the bankruptcy court. At issue in *Unimet* was the debtor's obligation under a collective bargaining agreement to pay insurance premiums on retiree benefits. The question presented in *Unimet* was whether § 1113 applied to retirees at all.[1] The debtor corporation had made a § 1113 motion seeking to repudiate the entire agreement, which was denied. In that setting, the Court held:

---

1. After the *Unimet* decision, Congress passed a bill it had been considering at the time of the decision, protecting retiree benefits in bankruptcy under 11 U.S.C. § 1114. The Supreme Court denied certiorari in the case in October 1988, after the enactment of § 1114 in June 1988, and thus when the issue was moot.

"In sum, our reading of 11 U.S.C. § 1113 leads us to the conclusion that Congress intended to give broad protection to collectively bargained for rights which are threatened by a corporate reorganization under Chapter 11 of the Bankruptcy Code." 842 F.2d at 885. It therefore accorded a superpriority to the retirees' claims. Although the claims involved obligations that continued postpetition, retiree claims cannot be considered necessary expenses of the debtor and therefore do not qualify as administrative expenses.

In *Unimet,* the debtor corporation, which continued to operate in bankruptcy, sought to reject continuing obligations—the payment of insurance premiums for retirees. In the case at bar, the debtor, which has ceased operation, seeks to order prepetition obligations requiring a one-time payment. The concern in *Unimet* and of Congress in enacting § 1114 was presumably that struggling corporations would use the Bankruptcy Code to offload what is an increasingly expensive cost of doing business, retiree insurance premiums, whether bargained for collectively or not. That concern has been highlighted by the Second Circuit in its decisions in *Ionosphere I* and *Century Brass.* Unimet did not want to pay the premiums at all, in any order of priority. Eastern will pay vacation pay, but under the priority scheme set out by the Code.

In a recent case involving vacation pay claims, the Third Circuit declined to follow *Unimet* and its progeny, finding the reasoning inapplicable. *Roth American,* 975 F.2d 949. There, as in the case at bar, the union "equate[d] the failure to give its claims first priority to a unilateral termination or alteration of the ... collective bargaining agreement." *Id.* at 955. The Court disagreed with that characterization, as the bankruptcy judge did in the case at bar, and held that:

> In enacting section 1113, Congress intended to preclude employers from using bankruptcy law as an offensive weapon in labor relations by going into bankruptcy and unilaterally rejecting or modifying the extant collective bargaining agreement (or exerting leverage at the

bargaining table by threatening to do so). However, there is no indication either from the language or the legislative history of section 1113 that Congress intended to address the priority to be given claims based on a collective bargaining agreement.

*Id.* at 956 (citing *Ionosphere I,* 922 F.2d at 990–991).

In reasoning similar to that employed by the Second Circuit in *Ionosphere I,* the Court further held that:

> The congressional goal embodied in section 1113 to give special consideration to a collective bargaining agreement and encourage the debtor and the union to reach a mutually acceptable agreement while the provisions of the current agreement remain in effect until the bankruptcy court authorizes unilateral rejection or modification of the agreement pursuant to section 1113[,] can be satisfied without interfering with the previously established statutory priorities.

*Id.* at 957.

The Third Circuit further reasoned that where a debtor has not sought to reject the collective bargaining agreement, "it simply does not follow ... that all claims under unrejected collective bargaining agreements are entitled to first priority." *Id.*

Several bankruptcy courts also have considered the issue of the priority of vacation pay claims under an unrejected collective bargaining agreement. Most notably, the bankruptcy court in *In re Ohio Corrugating Company,* 115 B.R. 572 (Bankr. N.D.Ohio 1990), *rev'd sub nom. United Steelworkers v. Ohio Corrugating Co.,* 1991 WL 213850, 1991 U.S.Dist. LEXIS 18815 (N.D.Ohio 1991), which, although reversed based on the precedent of *Unimet* within the Sixth Circuit (a case I decline to follow here), nonetheless suggests an important distinction between reorganizing and liquidating bankruptcies. *See* 115 B.R. at 576. The bankruptcy court emphasized that "[b]oth *Bildisco* and § 1113(f) contemplate the circumstances under which an *ongoing* business may alter the provisions of a collective bargaining agreement." 115

B.R. at 577 (emphasis supplied). *See also In re Armstrong Store Fixtures Corp.,* 135 B.R. 18 (Bankr.W.D.Pa.1992); *In re Murray Industries, Inc.,* 110 B.R. 585, 588 (Bankr.M.D.Fla.1990) ("the better view is one which reconciles § 507 with § 1113 and that § 1113 governs only the conditions under which a Debtor-in-Possession may modify or reject a collective bargaining agreement, but that the payment of employment-related prepetition obligations is governed exclusively by § 507"), *vacated as moot,* 140 B.R. 298 (Bankr.M.D.Fla. 1992). *But see In the Matter of Canton Castings, Inc.,* 103 B.R. 874 (Bankr. N.D.Ohio 1989) (following *Unimet* ); *In re St. Louis Globe–Democrat, Inc.,* 86 B.R. 606, 609–610 (Bankr.E.D.Mo.1988) (same).

The decision in *Ionosphere I* expressed a concern for protecting both the outcome of the collective bargaining process and the process itself; it does not require that § 1113 trump § 507 in the case at bar. Arbitration is a procedural device that results from the collective bargaining process and is not a regular incident of employment for nonunionized employees. Arbitration clauses are crucial to union influence in the workplace. On the other hand, all employees are entitled on contract principles to the wages and benefits they have earned. The obligation to pay wages earned is not unique to collective bargaining agreements. Although a union may secure higher rates and more favorable terms, the amounts, once set by the collective bargaining process, or directly between employer and employee, are owed once earned. In that regard, unionized and non-unionized employees are the same. Therefore, it is not necessary for § 1113 to supersede § 507 in order for any feature essential to preserving the collective bargaining process to be respected here, particularly when we are dealing with a liquidating Chapter 11 and the collective bargaining process has ended. Wages and vacation pay are regular incidents of employment, whether bargained for collectively or not.

Therefore, I agree with the outcome reached by the Third Circuit in *Roth American* and believe that that position is consistent with the Second Circuit's opinion in *Ionosphere I.* Sections 1113 and 507 can be interpreted congruently in setting the priority of vacation pay claims. The debtor is not avoiding its obligation to arbitrate as in *Ionosphere I,* or any other procedure specified by the collective bargaining agreement, nor is it avoiding its obligation to pay, as the debtor in *Unimet* was attempting to do. Rather, the unionized employees will be paid in keeping with the priority scheme set by Congress. That scheme took into consideration the competing interests of employees for pay and benefits and the interests of other creditors, secured and unsecured. Section 1113 expresses a purpose to protect the existence of collectively bargained agreements, but not to protect their every provision from the congressionally determined priority scheme. Judicial ordering of benefit claims pursuant to § 507 is not equivalent to employer avoidance of obligations under a collective bargaining agreement. The collective bargaining agreement is respected, but the financial obligations issuing from it are accorded priority consistent with the Bankruptcy Code.

That resolution is also consistent with the Second and Third Circuits' identification of a concern behind § 1113 that employers would use bankruptcy as an "offensive weapon" or "medicine" against unions. Because Eastern is no longer in operation and because a lump-sum payment is involved, we are not faced here with the concern in *Unimet* about an operating debtor offloading continuing financial obligations to former employees as part of a reorganization. Eastern will not be allowed to repudiate or avoid its obligations to its unionized employees within the meaning of § 1113(f).

### IV.

Appellants also claim that the bankruptcy judge erred in not requiring Eastern and ALPA to arbitrate a dispute over the interpretation of certain vacation pay provisions in the pilots' collective bargaining agreement. The provisions at issue state that pilots who retire or are furloughed, and the estates of those who die, receive not only

vacation pay earned through January 1 of the year of separation, the standard vesting date, but also any pay earned up to the date of separation, or the first day of the month in which the pilot dies. Pilots who resign or are terminated get pay earned only up to January 1. ALPA contends that this means that pilots who retired, died, or were furloughed within the 90–day prepetition period were entitled to full vacation pay from 1988, plus pay accrued to the date of retirement or separation. (Tr. at 17–18)

The Trustee contends that the issue has not been preserved for appeal, and that there is no arbitrable dispute. I find that the issue was raised below as to pilots who retired or were furloughed, but not as to pilots who died, if any. (Tr. at 8–9) However, the terms of the collective bargaining agreement require the pilots to file a grievance within 45 days, which they admit they did not do.[2]

No dispute exists as to the substance of the provisions of the collective bargaining agreements with respect to vacation pay. The Declaration of Alan Gibson, former Vice–President of Employee Relations at Eastern, submitted to the bankruptcy court in connection with the hearing in this matter, outlines both the general vacation pay provisions (Gibson Decl. ¶ 3) and the particular provisions applicable to pilots who retire or are furloughed. (Gibson Decl. ¶ 4) In addition, the Declaration attaches as exhibits the provisions of the ALPA/EAL collective bargaining agreement covering pilots who retire or are furloughed. Those exhibits, if not Gibson's Declaration, are of necessity consistent with ALPA's representations as to the terms of the pilots' contract. Therefore, the unions' claim must simply be that there is a dispute as to how the Bankruptcy Code operates on the substance of those provisions.

■ Therefore, even if I were to accept the pilots' argument that the filing of a

grievance was not required because it would have been futile, I find that the "interpretation" of the provisions at issue was not a matter for an arbitrator, but rather was a legal issue requiring, as with the other claims raised here, the application of the Bankruptcy Code to the terms of the collective bargaining agreement. *See In re Chicago, M., S.P. & P.R. Co.*, 852 F.2d 960, 965 (7th Cir.1990) (arbitrator confined to interpretation and application of collective bargaining agreement; arbitrator's decision based on interpretation of legislation exceeds scope of authority and is unenforceable) (citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 49, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974)).

■ Specifically, whether § 507 applies to the vacation pay claims of pilots who retired or were furloughed, and the manner in which it applies, is properly the subject of judicial analysis. The bankruptcy judge and this court have analyzed the interaction of § 1113 and § 507 and determined those sections' effect on all unionized employees' claims. The particular terms of the pilots' agreement do not alter the effect of that analysis. An arbitrator could only interpret the terms of the pilots' contract. However, the bankruptcy judge determined, and I agree, that under *Northwest Engineering* the judge is not obliged to follow the literal terms of the contract in ordering claims under § 507. Further, even if the judge were obliged to do so, it appears that his order is actually consistent with the terms of the ALPA/EAL agreement as they relate to pilots who retired or were furloughed. That those particular pilots ordinarily would get pay earned after January 1, 1989 does not entitle them to pay for all of 1988 as well, where the bankruptcy judge found pursuant to

---

2. Although Section 30 of the ALPA/EAL collective bargaining agreement was not included in the record on appeal and was not attached to the briefs, ALPA does not dispute the Trustee's quotation of its provisions. Therefore, although facts are not established in briefs, *see, e.g.,* 10A A. Wright, A. Miller & M. Kane, *Federal Practice*

*and Procedure,* § 2723 at p. 64 (1983 ed.); *Skyline Corp. v. NLRB,* 613 F.2d 1328, 1337 (5th Cir.1980), I nonetheless will proceed on the assumption that the Trustee's version of Section 30 accurately reflects the arbitration provisions of the ALPA/EAL collective bargaining agreement.

*Northwest Engineering* that all employees were entitled to pay from the 90–day period only, and not to pay for all of 1988.

\* \* \* \* \* \*

For the reasons stated above, the opinion of the bankruptcy court is affirmed.

SO ORDERED.