In re RAYMAN, MARTIN & FADER, INC., Debtor.

James D. JORDAN, et al., Appellants,

v.

RAYMAN, MARTIN & FADER, INC., and Bank of Maryland, Appellees.

Civ. No. K–94–45.

United States District Court, D. Maryland.

July 27, 1994.

Jerry M. Cutler, Baltimore, MD, for appellants.

Gary R. Greenblatt, Schwartz and Greenblatt, Alan M. Grochal, Mary F. Bradley, Tydings and Rosenberg, Baltimore, MD, Raymond E. DiBiagio, Jr., Glen Burnie, MD, for appellees.

Karen Moore, Office of U.S. Trustee, Baltimore, MD, Trustee.

FRANK A. KAUFMAN, Senior District Judge.

■ Appellants[1] herein appeal from the December 7, 1993, Order Denying Motion for Payment of Pre-petition Wages and Late Charges, entered in this case by Judge Schneider of the United States Bankruptcy Court for the District of Maryland.[2] Appellants contend that 11 U.S.C. § 1113(f) requires that their pre-petition claims be accorded super-priority above all other claims against debtor Rayman, Martin & Fader, Inc. ("Debtor").

Debtor is engaged in the business of providing drywall and acoustical services as a sub-contractor of contractors doing work in the Maryland, District of Columbia, and Virginia areas. In late 1985, Debtor became a signatory to a collective bargaining agreement ("Agreement") with the Carpenters District Council of Washington, D.C., and Vicinity ("Union"), which was the exclusive bargaining representative for appellants. Pursuant to the Agreement, Debtor employed appellants to perform drywall contracting work at sites at which Debtor had undertaken subcontract duties and was required to pay appellants' wages on a weekly basis. The Agreement prohibited Debtor from withholding those wages for more than four working days after completion of the work week and provided that, if Debtor in fact were to withhold those wages for more than four days, Debtor also would pay to appellants late charges in the amount of $25.00 per day until such time as the wages would be paid.

Due to financial difficulties, Debtor apparently experienced a severe cash-flow shortage through much of 1992. Consequently, Debtor admittedly failed to pay appellants their earned wages for the period from August 24, 1992, through September 11, 1992. Purportedly as a result of its economic problems, Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Maryland pursuant to Chapter 11 of the United States Bankruptcy Code ("Code") on September 11, 1992. Since that date, Debtor has continued in possession of its property and has operated its business as a Debtor-in-Possession pursuant to 11 U.S.C. §§ 1107 and 1108.

At the date of the filing of its bankruptcy petition, Debtor seemingly owed appellants a combined $44,076.07 in pre-petition wages for the said unpaid period, not including late fees. Debtor continued to employ appellants under the Agreement after September 11, 1993, making timely payments for those post-petition services. Appellants ceased working for Debtor on October 1, 1993.[3]

1. Forty former employees of debtor Rayman, Martin & Fader, Inc., collectively have noted their appeal in this case and are referred to in this Opinion as "appellants."

2. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158, despite the fact that the underlying Bankruptcy Court proceedings do not seem to have been concluded and that no motion for reconsideration of the Bankruptcy Court's determination in this case to date has been filed. Section 158 provides in pertinent part that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders and decrees ... of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges under section 157 of this title." Appellees have not challenged this Court's jurisdiction. However, this Court is required, in any event, to inquire *sua sponte* with regard thereto. Judge Schneider's aforementioned Order constitutes, for purposes of jurisdiction, a final judgment with regard to the status of appellants' claims. *See, e.g., Walsh Trucking Co. v. Ins. Co. of N. America,* 838 F.2d 698, 700–01 (3d Cir.1988); *In re St. Charles Preservation In-*

*vestors, Ltd.,* 112 B.R. 469, 472 (D.D.C.), *appeal dismissed,* 916 F.2d 727 (D.C.Cir.1990).

3. Apparently, appellants stopped working directly for Debtor as a result of an arrangement between Debtor and the RLR Company, Inc. ("RLR"), whereby RLR hired appellants and Debtor subcontracted to RLR the work which formerly had been performed by appellants pursuant to their Agreement with Debtor. That arrangement seems to have allowed Debtor to escape the burden of costly liability insurance to cover workplace injuries in connection with appellants. The Union agreed to those changes, and, on October 1, 1993, appellants began working for RLR. Consequently, appellants performed the same work after October 1, 1993, which they previously had performed for Debtor, but, instead of remaining employees of Debtor, they became employees of RLR.

Debtor contends that it understood that the new arrangement concerning post-October 1, 1993, work terminated the prior Agreement between Debtor and the Union. On November 22, 1993, Debtor filed a motion asking the Bankrupt-

On July 1, 1993, appellants filed a Motion for Approval and Payment of Pre-petition Wages and Late Charges as Super-priority Claims pursuant to 11 U.S.C. § 1113. In accordance with that motion, appellants sought immediate payment of the delinquent pre-petition wages and late fees in the amount of approximately $440,000.00. Appellants' motion was opposed both by Debtor and by the Bank of Maryland ("Bank"), which apparently is a creditor of Debtor in the ongoing bankruptcy court proceedings.

On December 7, 1993, Judge Schneider, of the United States Bankruptcy Court for the District of Maryland, entered the aforementioned Order denying appellants' motion. Through this appeal, appellants seek reversal of that Order.

Debtor admits that it owes appellants the pre-petition wages sought by appellants in this case, as well as the late charges provided in the Agreement. As in *In re Roth American, Inc.,* 975 F.2d 949, 954 (3d Cir.1992):

> [Debtor] concedes that [appellants] presented valid claims for ... [owed] pay. The dispute between the parties on this issue is limited solely to the *priority* to be accorded these claims

(emphasis added).

■ Because the single dispute in this appeal concerns an issue of law, this Court's review of Judge Schneider's Order will be made *de novo. See In re Energy Insulation, Inc.,* 143 B.R. 490, 494 (N.D.Ill.1992).[4]

11 U.S.C. § 507 "categorizes the claims [against a bankrupt estate] that are to receive distribution and ranks them ordinally." *In re Armstrong Store Fixtures Corp.,* 135 B.R. 18, 22 (Bankr.W.D.Pa.1992). Debtor and the Bank argue in this case that $2,000.00 of each appellant's individual claim falls within § 507(a)(3), with the remainder constituting general unsecured claims against

Debtor which are not entitled to priority treatment. Appellants do not assert that their claims fall within any of the categories enumerated in § 507; rather, their sole contention rests upon § 1113(f) and what appellants contend is its displacement of the § 507 priorities in this case.

Section 507(a) provides in pertinent part:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses ...

. . . .

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

■ Appellants urge this Court to determine that § 1113 supersedes § 507; however, "when two statutes are capable of coexistence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); *see also In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 991 (2d Cir.1990) ("*Ionosphere I* "), *cert. denied,* —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). Nevertheless, if, in fact, sections 1113 and 507 do conflict, this Court "must give effect to the most recently enacted statute [§ 1113] since it is the most recent indication of congressional intent." *Id.* at 991.

Section 1113 was enacted in response to the Supreme Court's decision in *Nat'l Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), in which the Court "held, in part, that

---

cy Court to declare the prior Agreement to have been terminated as a result of the RLR arrangement or, alternatively, to permit Debtor to reject the prior Agreement. This Court need not, and does not, determine the merits of those matters in order to decide this appeal. No party in this case disputes that the prior Agreement was in effect at the time the pre-petition work at issue in this case took place.

4. That court stated:

> When hearing an appeal from a bankruptcy court, the district court sits as an appellate court. Because the bankruptcy court's interpretation of section 1113 of the Bankruptcy Code is at issue, the court will review the bankruptcy court's ruling de novo.
>
> *Id.*

the filing of a petition in bankruptcy rendered collective bargaining agreements unenforceable[,] ... [allowing the debtor to] terminate unilaterally the collective bargaining agreement or alter its provisions prior to seeking bankruptcy court approval for rejection of an executory contract under [11 U.S.C.] § 365(a)."[5] *Ionosphere I*, 922 F.2d at 989; *see also Roth*, 975 F.2d at 955; *In re Unimet Corp.*, 842 F.2d 879, 881 (6th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988).

In *Roth*, 975 F.2d at 956, Chief Judge Sloviter explained:

> In enacting section 1113, Congress intended to preclude employers from using bankruptcy law as an offensive weapon in labor relations by going into bankruptcy and unilaterally rejecting or modifying the extant collective bargaining agreement (or exerting leverage at the bargaining table by threatening to do so). *See [Ionosphere I*, 922 F.2d at 990–91]. However, there is no indication either from the language or the legislative history of section 1113 that Congress intended to address the priority to be given claims based on a collective bargaining agreement.

*See also, e.g., In re Murray Indus., Inc.*, 110 B.R. 585, 588 (Bankr.M.D.Fla.1990) (stating that "§ 1113 governs only the conditions under which a Debtor-in-Possession may modify or reject a collective bargaining agreement, but that payment of employment-related prepetition obligations is governed exclusively by § 507"), *vacated as moot*, 140 B.R. 298 (M.D.Fla.1992).

"[S]ection 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement." *Unimet*, 842 F.2d at 884. Section 1113 provides in pertinent part:

> (a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter VI of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in ac-

cordance with the provisions of this section.

> ....

> (f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

In *In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 407 (2d Cir.1994) ("*Ionosphere III*"), the Second Circuit described its earlier holding in *Ionosphere I* as follows:

> In *Ionosphere I*, we held that section 1113(f) precluded the application of the automatic stay provisions of [11 U.S.C. § ] 362 to circumvent [the debtor's] obligation under a [collective bargaining agreement] to arbitrate a dispute with [the union], ... but that it did not preclude the stay of an action brought by [the union] in the Southern District of Florida to enjoin [the debtor] from "wet-leasing" aircraft to replace [the debtor's] aircraft that were grounded due to striking workers.

The Sixth Circuit, in *Unimet*, prohibited the debtor in that case from refusing to pay "retiree benefits" and concluded that, regardless of whether those benefits fell within the criteria of payable administrative expenses, "§ 1113 encompasses retiree benefits" and, thus, the debtor could not "escape its obligations" to pay. *Unimet*, 842 F.2d at 884. "It is not clear whether the Sixth Circuit in *Unimet* determined what *priority* should be accorded the union's claim; the court only reversed the judgment of the district court 'to the extent that it held that 11 U.S.C. § 1113 does not protect the interest of retirees.'" *Roth*, 975 F.2d at 957 n. 10 (quoting *Unimet*, 842 F.2d at 886).

"Subsection 1113(f) is circumstance specific rather than section specific." *Ionosphere I*, 922 F.2d at 991; *see also Ionosphere III*, 22 F.3d at 407. "Whether another Code provision is rendered inoperative by § 1113(f) depends on whether its application in a particular situation would defeat the purpose of § 1113(f)." *Armstrong*, 135 B.R. at 22 (cit-

---

5. Section 365(a) provides in pertinent part that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

ing *Ionosphere I* ). In *Ionosphere I*, the Second Circuit, in invalidating the bankruptcy court's stay of arbitration in that case, noted that "[t]he federal judiciary and Congress both have recognized the importance to the collective bargaining process of arbitration." *Ionosphere I*, 922 F.2d at 992. Consequently, "there was an irreconcilable conflict with section 1113, and the automatic stay could not be applied to stay the arbitration." *Ionosphere III*, 22 F.3d at 407.

> The obligation to pay wages earned is not unique to collective bargaining agreements. Although a union may secure higher rates and more favorable terms, the amounts, once set by the collective bargaining process, or directly between employer and employee, are owed once earned. In that regard, unionized and non-unionized employees are the same. Therefore, it is not necessary for § 1113 to supersede § 507 in order for any feature essential to preserving the collective bargaining process to be respected here.... Wages and vacation pay are regular incidents of employment, whether bargained for collectively or not.

*In re Ionosphere Clubs, Inc.*, 154 B.R. 623, 630 (S.D.N.Y.1993) ("*Ionosphere II* "), *aff'd*, *Ionosphere III*, 22 F.3d 403 (2d Cir.1994).

> Another factor—and one "[o]f most significance [—] is the fact that no language in section 1113 addresses the priority to be accorded claims. In contrast, [11 U.S.C. § ] 1114, which was enacted to protect retiree benefits, explicitly gives such claims administrative priority.... Similarly, in other situations in which Congress intended to alter the priority scheme established in section 507, it has done so explicitly." *Roth*, 975 F.2d at 956; *see also Ionosphere III*, 22 F.3d at 408. "The explicit language and the legislative history of § 1114 stand in stark contrast to the absence of any such language in § 1113." *Murray*, 110 B.R. at 587.

Additionally, giving effect to § 507 in this case does not impinge the purposes of section 1113.

> The debtor is not avoiding its obligation to arbitrate as in *Ionosphere I*, or any other procedure specified by the collective bargaining agreement, nor is it avoiding its

obligations to pay, as the debtor in *Unimet* was attempting to do. Rather, the unionized employees will be paid in keeping with the priority scheme set by Congress. That scheme took into consideration the competing interests of employees for pay and benefits and the interests of other creditors, secured and unsecured. Section 1113 expresses a purpose to protect the existence of collectively bargained agreements, but not to protect their every provision from the congressionally determined priority scheme. Judicial ordering of benefit [or pay] claims pursuant to § 507 is not equivalent to employer avoidance of obligations under a collective bargaining agreement. The collective bargaining agreement is respected, but the financial obligations issuing from it are accorded priority consistent with the Bankruptcy Code.

*Ionosphere II*, 154 B.R. at 630; *see also Ionosphere III*, 22 F.3d at 407; *Roth*, 975 F.2d at 957. To reiterate—in this appeal, Debtor does not challenge the amount owed to appellants; rather, appellants and Debtor disagree solely as to the priority to be accorded appellants' claims. *Cf. Ionosphere II*, 154 B.R. at 629 (noting that, in *Unimet*, the debtor sought to avoid payment of the claimed benefits altogether).

One of the central themes of the Bankruptcy Code is equality of distribution. [In] *In re Mammoth Mart*, 536 F.2d 950 ( [1st Cir.] 1976), the Court held "if one claimant is to be preferred over others, the purpose should be clear from the statute. To give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution, it dilutes the value of the priority for those creditors Congress intended to prefer."

*Murray*, 110 B.R. at 587. " 'Section 507 is intended to be the exclusive list of priorities in bankruptcy. Priorities are to be fixed by Congress. Courts are not free to fashion their own rules of superpriorities or subpriorities within any given priority class.' " *Ionosphere III*, 22 F.3d at 408 (quoting 3 Lawrence P. King, *et al.*, *Collier on Bankruptcy* ¶ 507.02[2] (15th ed.1993)). In this case, to grant appellants the preference

which they seek would be to treat their claims differently from those of any other potential unsecured creditors to whom payment may be owed for services rendered to Debtor, including any non-unionized employees.[6]

Furthermore, "construing section 1113(f) as mandating a first priority for all claims, whether earned pre-petition or post-petition, based on collective bargaining agreements would 'leave in its wake a series of anomalous results.'" *Roth*, 975 F.2d at 956 (quoting *In re The Ohio Corrugating Co.*, 115 B.R. 572, 578 (Bankr.N.D. Ohio 1990), *rev'd*, 1991 WL 213850 (N.D. Ohio March 15, 1991)).[7] For example, § 1113(f) "does not apply in Chapter 7 cases." *Id.* at 956 n. 9. "Why … should the very same pre-petition obligations receive an unlimited first priority if the employer debtor files under Chapter 11 but only a third or fourth priority, limited in dollar amount per employee, if the case is filed under Chapter 7?'" *Id.* at 956 (quoting *Ohio Corrugating Co.*, 115 B.R. at 578); *see also In re Moline Corp.*, 144 B.R. 75, 80 (Bankr. N.D.Ill.), *appeal denied*, 1992 WL 245669, 1992 U.S. Dist. LEXIS 14,202 (N.D.Ill. Sept. 17, 1992).

In the light of the foregoing reasons, this Court concludes that section 1113(f) does not establish a super-priority for appellants' claims in this case.[8] Accordingly, this Court, by separate Order of even date herewith, affirms the Bankruptcy Court's denial of super-priority status for appellants' claims. In that regard, this Court notes that appellants appear to remain eligible to seek, in the ongoing bankruptcy court proceedings below, third-priority status for $2,000.00 of each appellant's individual claim and general, unse-cured creditor status for the remainder of appellants' claims.[9]

---

6. Whether, in fact, there are any non-unionized employees owed wages by Debtor in the underlying bankruptcy proceeding is not clear from the record before this Court, but, in any event, the presence or the lack of the same would not alter this Court's determination.

7. Apparently, the bankruptcy court in *Ohio Corrugating* was reversed by the district court based upon that court's interpretation of *Unimet*. *See Roth*, 975 F.2d at 956.

8. Debtor also maintains that its refusal to pay the overdue wages and late fees represents merely a "breach" of the collective bargaining agreement, not a modification or alteration of that Agreement, and, thus, does not fall within the compass of § 1113. Appellants contend that debtor's failure does constitute an impermissible unilateral modification or alteration of the Agreement, bringing it within the scope of section 1113. Because this Court hereinabove concludes that § 1113 does not affect the priorities accorded claims under § 507 in this case, it is not necessary to determine whether Debtor's purported distinction is or is not a material one.

9. *See* 11 U.S.C. § 507(a)(3)(B), discussed *supra*.